**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| iCHARTS LLC,<br><br>          Plaintiff,<br>     v.<br><br>TABLEAU SOFTWARE, LLC,<br><br>          Defendant. | **CIVIL ACTION NO.   1:23-cv-1225**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff iCharts LLC ("iCharts") files this Complaint for patent infringement of U.S. Patent No. 8,271,892 ("the '892 Patent"), U.S. Patent No. 8,520,000 ("the '000 Patent"), and U.S. Patent No. 9,712,595 ("the '595 Patent") (collectively referred to as the "Asserted Patents") against Defendant Tableau Software, LLC ("Tableau") and alleges as follows:

## NATURE OF ACTION

1.     This is a civil action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1 *et seq*., including §§ 271 and 281–285, for infringement by Tableau Software, LLC, of one or more claims of each of the Asserted Patents.

## THE PARTIES

2.     Plaintiff iCharts is a limited liability company organized and existing under the laws of the State of Delaware. iCharts maintains a registered agent and registered office at 1209 Orange Street, Corporation Trust Center, Wilmington, DE 19801.

3.     Upon information and belief, Defendant Tableau Software, LLC is a limited liability company organized and existing under the laws of the State of Delaware. Tableau has a place of business at One American Center, 600 Congress Ave, Suite 2500, Austin, Texas 78701.

## JURISDICTION AND VENUE

4.     This Court has exclusive subject matter jurisdiction over this case for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Tableau consistent with the principles of due process and/or the Texas Long Arm Statute.

6.     Personal jurisdiction exists generally over Tableau because Tableau has sufficient minimum contacts with the forum as a result of business conducted within the State of Texas and the Western District of Texas, particularly in Austin, Texas, and Tableau is registered with the Secretary of State to do business in the State of Texas. Personal jurisdiction also exists over Tableau because it, directly or through subsidiaries or intermediaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and this District, particularly in Austin, Texas, that infringe one or more claims of the Asserted Patents, as alleged more particularly below. Upon information and belief, Tableau employs people in its Austin office to design, test, market, and sell the Accused Products (defined below), which infringe the Asserted Patents. On information and belief, employees in Tableau's Austin office, or that report to the Austin office, induce customers to buy, use, test, and sell the Accused Products, which infringe the Asserted Patents.

7.     In addition, on information and belief, Tableau has knowingly induced, and continues to knowingly induce, infringement by others within the United States and this District by advertising, marketing, and directing products containing infringing functionality to consumers, customers, manufacturers, distributors, resellers, partners, and/or end users in the United States and by providing instructions, user manuals, advertising, and/or marketing materials that facilitate, direct, or encourage the use of infringing functionality with knowledge thereof. *See, e.g.*, http://www.tableau.com.

8.      Venue in this District is proper under 28 U.S.C. §1400(b) because Tableau, either through its own acts and/or through the acts of its agents, has committed acts of infringement in this District by making, using, selling, and/or offering to sell infringing products, inducing infringement, or contributing to infringement, within this District, particularly in Austin, Texas, and upon information and belief, Tableau has a regular and established place of business in Austin, Texas. Tableau directly and/or indirectly develops, designs, manufactures, uses, distributes, markets, tests, offers to sell, and/or sells software that infringes the Asserted Patents in the United States, including in this District, and otherwise purposefully directs infringing activities to this District in connection with its software.

## TABLEAU'S INFRINGING PRODUCTS

9.      Tableau is a data analytics platform focused on making data accessible through visualization. Tableau offers two hosting options for its platform. Tableau offers a fully cloud-based system (e.g., Tableau Cloud formally known as Tableau Online) to create, publish and embed interactive charts into websites. *See* http://www.tableau.com/products/cloud-bi. Tableau Cloud allows users to publish dashboards and share interactive visualizations with colleagues or customers. Tableau Cloud is accessible from a browser or mobile app. Tableau also offers Tableau Server, an on-premises solution for any enterprise to self-host visualizations. *See* http://www.tableau.com/products/server. Tableau Server in conjunction with Tableau Desktop allow users to create and publish interactive visualizations. *See, e.g.*, https://www.tableau.com/products/desktop. Tableau Desktop can also publish interactive visualizations to Tableau Cloud.

10.     Tableau also offers Tableau Public that is a free platform that allows users to explore, create, and publicly share data visualizations online. *See, e.g.*, https://www.tableau.com/products/public. Tableau Desktop can also publish to Tableau Public.

11.     Tableau offers other software in conjunction with Tableau Cloud, Tableau Desktop/Server, Tableau Public that enables users to share interactive visualizations more easily with colleagues or customers. For example, Tableau offers Tableau Prep which allows for "data preparation, making it easier and faster to combine, shape, and clean data for analysis." *See, e.g.*, https://www.tableau.com/products/prep. Tableau AI analyzes data to "create predictive models without needing to write algorithms." *See, e.g.*, https://www.tableau.com/products/our-platform; https://www.tableau.com/products/tableau-ai. Tableau's CRM Analytics analyzes CRM data to find patterns and actional insights for business. *See, e.g.*, https://www.tableau.com/products/crm-analytics. Data Cloud for Tableau allows users to "unif[y] data from any source, … making it easy for everyone in your organization to visualize, automate, explore, and act on data." *Id.* "Data Cloud for Tableau takes the complexity out of building a real-time customer data platform, so you can discover customer insights and make data-driven decisions." *Id.* Tableau Data Management allows users to better manage their data and deliver "self-service analytics by scaling data automation and operationalization…." *See, e.g.*, https://www.tableau.com/products/data-management. Tableau Advanced Management offers "configurable capabilities" that allow administrators to "meet tough security requirements while delivering an improved end-user experience." *See, e.g.*, https://www.tableau.com/products/advanced-management. Tableau Embedded Analytics helps users "integrate Tableau analytics into [their] products, applications, and web portals…." https://www.tableau.com/products/embedded-analytics.                *See                also*, https://www.tableau.com/solutions/exchange/accelerators; https://www.tableau.com/trial/tableau-templates.

12.     Tableau has i) directly infringed, literally or under the doctrine of equivalents,  and continues to directly infringe, and ii) indirectly infringed and continues to indirectly infringe, at

least one claim of each Asserted Patent in this District, and elsewhere within the United States by, among other things, making, using, selling, and/or offering to sell software that is part of its Tableau Platform, including but not limited to Tableau Cloud, Tableau Desktop, Tableau Server, Tableau Public, Tableau Prep, Tableau AI, Tableau CRM Analytics, Data Cloud for Tableau, Tableau Data Management, Tableau Advanced Management, Tableau Embedded Analytics (collectively referred to herein as the "Accused Products").  All versions of the Accused Products operate in the same way with respect to the claims of the Asserted Patents.

## BACKGROUND

### iCharts: Data Visualization Ahead of its Time

13.     Founded in 2008, iCharts, Inc. (the original assignee of the Asserted Patents, referred to as "iCharts" in this Background Section) became the first scalable, online interactive charts design, creation and distribution platform in the cloud that included Fortune 500 companies. iCharts founders recognized it was too difficult to bring interactive charts online. They developed an easy way to create, share, and embed interactive charts into websites and other documents.

14.     Shortly after its founding, iCharts was one of fifty startups invited to attend TechCrunch's "TechCrunch50 Conference" to launch its company and pitch to venture capitalists like Mark Cuban, who were publicly assessing iCharts in a precursor format to "Shark Tank". During iCharts' presentation, Mr. Cuban recognized iCharts' value in reducing the complexity of interactive chart creation and sharing. Mr. Cuban commented publicly "[y]ou have the easiest business model of everyone. Rather than being YouTube, you should license this great product to companies that don't want to recreate the products and would rather you do it. Tell the companies that they can either spend time and money doing charts themselves or pay you for what you do best. Don't follow the heroes, just follow the money." (https://techcrunch.com/2008/09/09/tc50-icharts-eases-the-creation-and-distribution-of-interactive-charts/).

15.     iCharts provided its web-platform to TechCrunch to publish data visualizations, or charts, about how many companies were laying people off during the 2008 Financial Crisis, as well as venture capital market stats published by the National Venture Capital Association. iCharts initially raised $3.1M (https://techcrunch.com/2012/02/28/charts-for-everyone-cloud-based-icharts-picks-up-3-1-million-for-consumer-push/).

16.     The proverbial 'light bulb' moment that led to the conception of iCharts' platform occurred when Mr. Duncker, the founder of iCharts, saw webpages with embedded videos and decided to develop interactive charts that would be as easy to embed in websites as videos.

17.     At the time of the invention, there were no easy, simple, web-based or "on-line service" (today known as Software-as-a-service or "SaaS") platforms for the design, generation, and publication of an interactive chart that could be easily embedded in documents, e.g., webpages. The platform that iCharts developed was web-based to allow access to anyone on the internet. It provided a design studio, via its portal and user interface, for the design, data selection, and generation of an interactive chart (into a chart object). The chart object could then be published, making it available to embed in a document, along with any interactivity code and initial data. Additional or updated data associated with a chart could be fetched later as a user interacted with a chart.

18.     iCharts' platform provided a way for users to take data they created with other services like Excel or Google Spreadsheets, and upload that data directly to iCharts. Once collected, users needed to only drag and drop the data to the chart to create a fully modifiable and interactive chart using iCharts' studio, a user interface that allowed users to create charts based on various templates. At the bottom of every iChart, controls let users modify the view and change

the data series. In addition to being able to zoom into a data range and highlight the most relevant data, users could upload audio files that they recorded to accompany the chart.

19.     iCharts also allowed users to publish interactive charts online for embedding in webpages, PowerPoint presentations, or PDF files. An author of a chart object could also decide to 'share' any generated interactive chart object, making it available for downstream-users to embed in their own documents (i.e., a chart object, along with any interactivity code, and initial data or via links to them). The embedded interactive chart did not require server communication for its interactivity features, rather it executed the dynamic interactivity code (written in flash, interpreted and executed on the client-side). Data server communication would be required for retrieval of any new data or additional data as a user interacted with an embedded chart.

20.     iCharts branded itself as "YouTube for interactive charts" because it allowed users to embed charts into webpages as easily as videos.   The embedded charts maintained their interactivity when embedded in webpages, even when webpages were decoupled from their design or generation servers. Downstream-users who embedded a chart in their own webpages required a web browser and online connectivity to use a shared chart.

21.     To accomplish iCharts' interactivity, iCharts implemented a change to the underlying architecture of rendering charts on webpages. Prior to the implementation of iCharts' technology, when charts were published on the Internet, they were basically static images. What you saw was all you got. In an attempt to mimic interactivity, when a user wanted to interact with the chart, some systems would make a call to a server to re-render the chart (server-side re-rendering) and then send the re-rendered chart, as a whole new webpage to the client browser. For example, if a user wanted to move a slider on the chart, the webpage would make a call to the

server, which would send a new webpage to the client—containing a slightly different static image of the chart. Thus, no re-rendering occurred on the client side.

22.     iCharts implemented an architecture that would allow the re-rendering to occur on the client-side, so the charts remained interactive  even on a webpage decoupled from the generation interface in which they were created.  This new architecture required new software module to be developed.

23.     Some of the required architectural modules were a web-based User Interface for designing charts (i.e., design studio, having a data pane and chart pane), a data module to store data, a generation module to create an interactive chart (e.g., as a FLASH object), and a sharing module that would give access to the charting object or a code snippet for embedding in web pages or other documents. The architectural components were unconventional at the time of the invention. For example, there were no design studio, generation module, or sharing module (having the capability of the programmed modules) that iCharts could have used as Lego building blocks to assemble iCharts' Interactive-Charts Platform.

24.     As such, the architectural components were individually coded/programmed by the iCharts inventors. The web-based design studio was written in FLASH. Other users of FLASH were not using the language to program a charting design studio. FLASH was conventionally used to display  multimedia images and videos. Other components were written in Java, as no conventional, off-the-shelf components existed to incorporate into iCharts' platform.

25.     The generation module created a FLASH interactive chart object (along with any interactivity code, and data associations) that retained interactivity without requiring server re-rendering of the chart. Data servers would be communicated with for any new or updated data requirements as a user interacted with a chart. This client-side architectural shift was implemented

as dynamic, interactivity code (as flash in the implementation). The interactivity code would be interpreted or executed on the client-side. Thus the  use of flash in the iCharts commercial embodiment was also not conventional.

26.   iCharts' Interactive-Charts platform provided several advantages. Users did not require the installation of an application on their own local servers or desktops. Instead users only required a browser and internet access tp use iCharts' portal. The portal was used to design, generate, publish and share interactive charts. The portal was not required for using the charts in other webpages. On the other hand, Excel required other users to have Excel installed on their own computers in order to view an Excel chart. In iCharts' platform, the generation engine was decoupled from the use of the interactive charts. The generated interactive charts, embedded in other pages, did not require communication with the design or generation modules. The interactive charts were shareable and usable across the internet.. Importantly, the architectural shift to client-side re-rendering for interactivity, discussed above, provided the required architecture to scale to the large numbers of users in the data visualization market.

27.   In 2013 and 2014, iCharts partnered with NetSuite, the leading provider of cloud-based financials and financial data visualizations, to implement iCharts' charting architecture to service the entire NetSuite system.

28.   By 2016, iCharts provided enterprise-grade, cloud-based visual analytics and reporting tools for NetSuite and the Google Cloud Platform. iCharts was named the winner of the 2016 NetSuite SuiteApp of the Year. The company's vision was to empower every business to become more data-driven by making business intelligence more accessible, more actionable, and more assistive.

29.     iCharts and Tableau were competitors. Upon information and belief, in 2008, Tableau was not offering a web-based data visualization platform and thus was not offering data visualization software that allowed code to be executed on the client away from the server for visualizations to maintain interactivity.

30.     Upon information and belief, at the beginning of 2010, Tableau began offering its free product Tableau Public in v5.1, which "allowed students, bloggers, and data journalists to share data visualizations more broadly on the web." https://www.tableau.com/blog/analyzing-history-tableau-innovation. Tableau Public was a key step to Tableau Online in v8.0 (March 2013), its cloud-based product. Upon information and belief, this is around the time Tableau adopted iCharts' underlying architecture of allowing client-side re-rendering on webpages. Upon information and belief, after adoption of iCharts architecture, Tableau experienced significant revenue growth.

31.     iCharts' client-based re-rendering architecture is now industry standard. Today, where essentially every computer is processing data and presenting visualizations on the web, it would not be scalable to use server-side rendering every time a user interacted with a chart online.

32.     In 2017, iCharts and Tableau discussed a potential acquisition of iCharts by Tableau during which iCharts made Tableau aware of iCharts' patent portfolio including the Asserted Patents.

## ASSERTED PATENTS

**(a)     United States Patent No. 8,271,892**

33.     On September 18, 2012, the '892 Patent, entitled "Creation, Sharing and Embedding of Interactive Charts," was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Serial No. 12/205,802, filed on September 5, 2008, attached as Exhibit A.  iCharts is the owner, by valid assignment, of the entire right, title,

and interest in and to the '892 Patent, including the right to assert all causes of action arising under the patent and the right to any remedies for infringement of the patent.

34.     The '892 Patent pertains to particular systems and methods for generating and sharing interactive charts. The interactive charts are "generated in an online portal" that allows users to "customize the interactive features of the chart." '892 Patent, Abstract. The interactive chart "can be shared by, for example, embedding the interactive chart" in a webpage or an external electronic document, that can be shared with other users. *Id*. Additionally, "[t]he interactive chart and/or the data associated with the interactive chart" may be purchased through "an online store environment or otherwise shared with other users." *Id*.

35.     The systems and methods of the '892 Patent are designed, *inter alia*, to solve then-existing technical problems in computers and prior art interactive charts.

36.     The '892 Patent solved these known technical problems in a particular way—by providing a computer system and method for creating a self-contained and independent interactive chart object, publishable and shareable on the internet, while maintaining the chart's interactivity in the absence of the generation system used for the charts creation. The '892 patented invention decoupled the generation of interactive charts, from viewing of interactive charts. For example, webpages that embedded any iCharts' generated interactive charts did not require access to the generation platform. The webpage would be functional with the interactive chart, without requiring server-side communication for interactivity. Data-server communication would be required for any new data or updated data required for re-rendering.

37.     The inventive chart system of the '892 Patent presents unique advantages over the conventional technologies. It allowed computer systems, for the first time, to receive user feedback from embedded charts on websites without the need for the underlying program used to generate

11

the chart and without the need of re-generating the chart each time the user interacted with the chart. Once an interactive chart is generated by a chart generator on a server with a chart template and embedded as a self-contained document independent of the chart generator, the interactive chart retains interactivity. The generation of interactive charts can be done with the full power of a chart generator and chart templates from a template store located on a server. Once generated, the interactive chart can be embedded as a self-contained electronic document to be shared. Further, such an embedded interactive chart, even though independent of the chart generator, still retains interactivity by, for example, allowing a user to interact with the chart.

38.     The '892 Patent discloses "an interactive chart online portal **200** [that] includes an interactive chart generator **204**, an interactive chart sharer **208**, a user interface **212**, a data store 216 and a chart template data store **220**." *Id*. at 9:13–16. The "interactive chart generator 204 uses data and chart templates stored in the chart template data store **220** to generate the interactive charts." *Id*. at 9:30–32.

39.     The '892 Patent discloses that the user can "also share the chart **1700** by publishing the chart, as shown in FIG. 30, by selecting publish button **1616**. As shown in FIG. 30, a popup window **3000** is accessed when the publish button **1616** is selected." *Id*. at 14:41–44.  The popup window allows the user to download chart as interactive object for embedding into a webpage. The users can "select to embed the object as a link, co[de] snippet or download or embed as an interactive object. The chart may be part of a portal or script. The user can then publish the chart online." *Id*. at 14:57–60.

40.     The generated interactive chart can be published on an external webpage as an interactive chart. According to another aspect of the invention, "a computer-implemented method is provided that includes publishing an interactive chart on a webpage; modifying the data

associated with the interactive chart; and automatically updating the published interactive chart on the webpage." *Id*. at 2:32–36.

41.     Once the interactive chart was created, it could be downloaded as an interactive self-contained object. The '892 Patent discloses that the stored interactive chart could be a "flash object." The '892 Patent describes one embodiment of "the interactive chart **300**" as "a flash file that contains code that a) renders the chart, b) obtains input from the user as per his desired action on this chart (i.e., interactivity), and c) re-renders the chart using the input as parameters." *Id*. at 9:51–54. The interactive chart data could be "stored within the flash file." *Id*. at 9:54–55. The flash file would contain dynamic code, executed on the client-side for interactivity.

42.     When creating a website, the interactive charts are stored online as flash files. To embed a chart into a website, a retrieve code is generated and "embedded into that sites' [sic] HTML code." *Id*. at 9:61. When that web page is loaded into a browser the embedded code "fetches the flash file from the server." *Id*. at 9:62. The use of embeddable objects eliminates the need for "any particular knowledge of coding or HTML." *Id*. at 9:65.  If the chart is modified on the server, such as being updated with new data, the flash file is updated accordingly. *Id*. at 9:65–67. The next time the web page with the embedded code is refreshed, the updated chart is displayed. *Id*. at 10:1–3. In one embodiment, "the page may be refreshed automatically for a semi-live stream of data or the data may [be] stored separately from the flash file, the separate data file fetched dynamically for real time feeds." *Id*. at 10:3–6. Thus, the interactive charts "that are downloaded are self-contained flash files independent of the web portal" used to create the interactive chart. *Id*. at 10:7–8. Any electronic document that can play flash, for example, can show the interactive charts. *Id*. at 10:9–11. There is thus no need for the user to have access to the software or online platform originally used to create the interactive chart.

43.     If the user selects the option to "republish the chart **3608**, the user can select to list the chart in the online portal and/or automatically republish the chart if changes are made. The republish option 3608 therefore allows users to update the interactive charts that are embedded online." *Id*. at 15:40–44. If the user selects the option to "stop publishing the chart **3612**, websites where the chart has been embedded show a message that the chart has been removed. The popup window **3504** may also include the embed code for the chart **3616** and/or the URL (uniform resource locator) for the net portal where the chart is located **3620**." *Id*. at 15:45 –50.

44.     The language of each of the claims, including Claim 1, is consistent with the inventive concepts described in the specification. For example, Claim 1 recites a "computer system" that comprises a "data module" for storing data that is to be charted in the interactive chart, a "chart template module" that is configured to store "chart templates, and a "generation module" configured to generate an interactive chart on a generation interface. The generation module allows the user to generate an interactive chart using the data from the data module and a template from the chart template module. The computer system of Claim 1 also comprises a "sharing module" configured to enable the user to publish the interactive chart as a "self-contained and independent electronic document." The "self-contained and independent electronic document" is capable of rendering in absence of the generation interface and the chart template module, and being re-rendered using user input as a parameter. This allows the "self-contained and independent electronic document" to retain its interactivity when it is published or embedded.

(b)     **United States Patent No. 8,520,000**

45.     On August 27, 2013, the '000 Patent, entitled "Creation, Sharing and Embedding of Interactive Charts," was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Serial No. 12/372,696, filed on February 17, 2009, attached as Exhibit B.  iCharts is the owner, by valid assignment, of the entire right, title, and interest in

and to the '000 Patent, including the right to assert all causes of action arising under the patent and the right to any remedies for infringement of the patent.

46.     The '000 Patent is a continuation-in-part of the '892 Patent. The '000 Patent also pertains to particular systems and methods for generating and sharing interactive charts. The '000 builds on the inventive concepts of the '892 Patent. The '000 Patent discloses that "the interactive charts are generated in an online portal that allows users to customize the interactive features of the chart." '000 Patent. Abstract. An online portal may also be provided to allow "users to automatically embed interactive chart(s) in another website without reprogramming the code of the website each time the interactive chart(s) are changed or new interactive chart(s) are added." *Id*. In other words, the interactive charts can also be embedded in other websites without the need to reprogram the other websites each time an interactive chart is embedded in those websites using a chart box tool.

47.     The '000 Patent also discloses a chart box that "includes multiple interactive charts" that are "in a chart selection pane **4314**." *Id*. at 16:31–14. The chart box may be, for example, "a flash widget" and embedded into a first website. *Id*. at 2:27. Each of the interactive charts "may be selected for display in the viewing pane **4306**". *Id*. at 16:15. The "chart box **4304** may allow for a user to scroll through multiple interactive charts **4313** for display in the viewing pane **4306** using a page selection tool **4316** or scrolling arrows **4318**." *Id*. at 16:16–19. A user may "select possible interactive charts for inclusion in the chart box 4304 using the toolbar **4504**." *Id*. at 16:29–31. The user may use a "charting pane **4508** to view and/or browse the interactive charts **4512** that can be selected for display in the chart box **4304**." *Id*. at 16:31–33. The user interface also includes a "chart box region **4516** that includes a chart box folder **4520**." *Id*. at 16:34–35. The "chart box folder **4520** is connected to the chart box **4304** such that the retrieve code for data feed displays

the interactive chart(s) selected by the user in the chart box folder **4520**." *Id*. at 16:35–38. The user can "select the interactive chart(s) for display in the chart box **4304** by, for example, dragging and dropping one or more of the charts **4512** onto the chart box folder **4520**. When the user drops the selected chart(s) **4512** onto the chart box folder **4520**, the chart is automatically displayed in the chart box **4304** embedded on the user's website." *Id*. at 16:38–44.

48.     Prior to the invention, to develop and incorporate the appearance of interactive charts, a programmer had to be hired to "develop the chart, link it to a data source and embed it onto the web-site." *Id*. at 16:47–48. In contrast, by embedding the charts with the chart box in the website and using the chart box tool, "no programming is required to embed charts in the website." *Id*. at 16:52–53. In addition, the number of charts that can be displayed using the chart box is unlimited. *Id*. at 16:55. In order to change the charts displayable in the chart box, "no programming is required because a user only needs to drag and drop the chart(s) using the tool." The costs are "therefore a fraction of the present cost, effectively removing a barrier to more visual data content on the web." *Id*. at 16:56–59.

49.     The language of each of the claims, including Claim 1, is consistent with the inventive concepts described above, as found in the '000 Patent specification. Claim 1 recites a computer implemented method comprising the steps of: i) "receiving a selection, on a first website, of at least one interactive chart from a plurality of interactive charts," and ii) "displaying, in response to the selection the at least one interactive chart embedded in a chart box on a second website, wherein the chart box is a web widget." *Id*. at 18:24–29. At "least one interactive chart is generated on a generation interface that is configured to allow a user to generate an interactive chart from a chart template store." *Id*. at 18:30–33. Further, "at least one interactive chart is displayed on second website in absence of the generation interface, which enables the user to a)

render the chart, b) obtain input from a user and c) rerender the chart using the input thereby enabling the interactive chart to retain interactivity." *Id*. at 18:34–39.

   **(c)      United States Patent No. 9,712,595**

50.      On July 18, 2017, the '595 Patent, entitled "Creation, Sharing and Embedding of Interactive Charts," was duly and legally issued by the United States Patent and Trademark Office from U.S. Patent Application Serial No. 14/530,309, filed on October 31, 2014, attached as Exhibit C.  iCharts is the owner, by valid assignment, of the entire right, title, and interest in and to the '595 Patent, including the right to assert all causes of action arising under the patent and the right to any remedies for infringement of the patent.

51.      The '595 Patent is a continuation of the '000 Patent and a continuation in part of the '892 Patent. The '595 Patent reflects the same inventive concepts as the '000 Patent and the '892 Patent.

52.      The language of each of the claims, including claim 1, is consistent with the inventive concepts described above, as found in the specification. For example, Claim 1 of the '595 is similar to Claim 1 of the '892 Patent; it more narrowly claims that the interactive chart is being published onto a second website that is separate from the first website where the user is creating the interactive chart. Claim 1 of the '595 Patent recites a "system for creating interactive charts" that comprises a "memory that stores a chart template." '595 Patent at 18:41–43. Claim 1 further claims a "processor" that executes instructions stored in the memory to "generate a user interface on a first website, receive chart data via the user interface, receive a selection of the chart template via the user interface, and "generate an interactive chart including the chart data and the chart template." *Id*. at 18:44–51. Claim 1's system further includes "a network interface that, in response to generation of the interactive chart, transmits the interactive chart to a second website for display without the execution of the instructions stored in the memory to generate the user

interface of the first website wherein the second website receives an input from a second user and updates the interactive chart after the second website receives the input." *Id*. at 18:52–59.

## <u>COUNT 1: INFRINGEMENT OF U.S. PATENT NO. 8,271,892</u>

53.     iCharts incorporates the foregoing paragraphs as if fully set forth herein.

54.     Tableau has, alone or in concert, directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least independent claim 1 of the '892 Patent in this District, and elsewhere within the United States by, among other things, making, using, selling, and/or offering to sell the Accused Products.

55.     The Accused Products meet each and every element of at least claim 1 of the '892 Patent in violation of 35 U.S.C. § 271(a).

56.     Tableau maintains "[a] computer system." For example, Tableau Cloud allows users to "[e]xperience a fully-hosted, cloud-based, enterprise-grade solution" on the Tableau platform. http://www.tableau.com/products/cloud-bi. Tableau Cloud is a "self-service platform" that allows users to "prepare [their] data, author, analyze, collaborate, publish, and share in Tableau Cloud." http://www.tableau.com/products/cloud-bi.

57.     Tableau's computer system includes "a data module configured to store data." The Accused Products store data. For example, Tableau Cloud allows users to prepare data, author, analyze, collaborate, publish, and share it. http://www.tableau.com/products/cloud-bi. Additionally, Tableau Data Management allows users to manage the data within Tableau Cloud. https://help.tableau.com/current/blueprint/en-us/bp_data_management.htm. Tableau also allows user to bring data directly into Tableau's database when users take data offline. *See, e.g.*, https://www.tableau.com/products/desktop. Tableau also creates charts that are stored in the memory of Tableau-controlled servers. In Tableau, users can preview the chart data in a data module.

58.     Tableau's computer system includes "a chart template module configured to store" workbooks that Tableau describes as "templates" to create interactive charts. The Accused Products have a chart module configured to store templates. *See, e.g.*, https://www.tableau.com/trial/tableau-templates; https://www.tableau.com/learn/articles/sales-dashboards-examples-and-templates; https://www.tableau.com/blog/jeff-plattner-start-saving-time-tableau-dashboard-templates-workbook.

59.     Tableau's computer system includes "a generation module configured to generate an interactive chart on a generation interface." The generation module of the Tableau system is "configured to enable a user to generate the interactive chart from data stored in the data module and a template from the chart template module." The Accused Products allows users to select chart data and a chart template and create an interactive chart.

60.     Tableau's computer system includes "a sharing module configured to enable a user to publish or embed the interactive chart as a self-contained and independent electronic document." For example, the Accused Products provide a network interface that allows users to transmit interactive charts to other websites. Tableau calls this operation "Publish." Tableau Cloud allows users to "[p]ublish dashboards and share your discoveries with anyone." *See, e.g.*, https://www.tableau.com/solutions/industries/public-sector/education-non-profits; https://www.tableau.com/products /cloud-bi. The "published" interactive chart can be seen on a second website. By selecting a zoom function, for example, the published interactive chart can be modified without using the user interface on the first website. Thus, the self-contained and independent interactive chart, "when opened in a program in the absence of the generation interface and the chart template module, enables a user to a) render the chart, b) obtain input from

a user and c) rerender the chart using the input as a parameter thereby enabling the interactive chart to retain interactivity when published or embedded."

61.    Upon information and belief, Tableau has had knowledge of the '892 Patent and its infringement activities at least as early as August 2017.

62.    Upon information and belief, Tableau also indirectly has infringed and continues to indirectly infringe one or more claims of the '892 Patent under 35 U.S.C. § 271(b) and/or (c). Upon information and belief, Tableau has had knowledge of the '892 Patent at least as early as August 2017. Tableau knowingly induces the direct infringement of the '892 Patent by its customers and end users by directing, instructing, and encouraging them to install, use, sell, or offer to sell the Accused Products. Tableau has actively induced such direct infringement through its contacts with customers thereby providing, *inter alia*, functionality, instructions, user manuals and other documentation and other assistance that have served to facilitate, promote, and/or cause customers to directly infringe at least one claim of the '892 Patent. The Accused Products constitute a material part of the computer system, or practice at least one of the methods, of at least one claim of the '892 Patent, have no substantial non-infringing uses, are not staple articles of commerce, and are specifically made and adapted for use in an infringing manner, as discussed above. Upon information and belief, Tableau has performed the acts that constitute indirect infringement with the knowledge or willful blindness that the resulting acts thereby would constitute direct infringement by customers.

63.    As a direct and proximate consequence of Tableau's infringement of the '892 Patent, iCharts has suffered damages in an amount not yet determined for which iCharts is entitled to relief.

### COUNT 2: INFRINGEMENT OF U.S. PATENT NO. 8,520,000

64.    iCharts incorporates the foregoing paragraphs as if fully set forth herein.

65.   Tableau has, alone or in concert, directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least independent claim 1 of the '000 Patent in this District, and elsewhere within the United States by, among other things, making, using, selling, and/or offering to sell the Accused Products.

66.   The Accused Products meet each and every element of at least claim 1 of the '000 Patent in violation of 35 U.S.C. § 271(a).

67.   Tableau maintains a system for performing a computer-implemented method. For example, the Accused Products allows users to publish dashboards and share interactive visualizations. http://www.tableau.com/products/cloud-bi.

68.   The Accused Product's software executed on Tableau-controlled servers and computers performs the step of "receiving a selection, on a first website, of at least one interactive chart from a plurality of interactive charts…. wherein the at least one interactive chart is generated on a generation interface configured to allow a user to generate the interactive chart with a chart template from a chart template store, … wherein the selection is made by dragging and dropping the at least one interactive chart from the plurality of charts into a chart box folder connected to the chart box such that retrieve code for data feed displays the at least one interactive chart on the first website…." The Accused Products receive a selection of an interactive chart, where the selection is made by dragging and dropping the selected interactive chart into a chart box folder. The Accused Products allow the user to select data from multiple sources. The Accused Products show multiple chart templates available for selection by the user. For example, Tableau Cloud allows a user to create an interactive chart by, first, selecting chart data from a list of options, and then selecting a chart template from an assortment of template examples. The user selects the chart

data and chart template by dragging and dropping their selections into a folder that then displays the interactive chart.

69.     The Accused Product's software executed on Tableau-controlled servers and computers performs the step of "displaying, in response to the selection the at least one interactive chart embedded in a chart box on a second website, wherein the chart box is a web widget … wherein the at least one interactive chart, when displayed on the second website in the absence of the generation interface, enables a user to a) render the chart, b) obtain input from a user and c) rerender the chart using the input thereby enabling the interactive chart to retain interactivity…." The Accused Product provides a network interface that allows users to transmit interactive charts to other websites. Tableau calls this operation "Publish." The Accused Products allow the user to create an interactive chart. After a user creates an interactive chart, the Accused Products allow the user to "publish" the chart. The Accused Products show the user a "Publish" button. The "published" interactive chart can be seen on a second website. By selecting a zoom function (as shown above), the published interactive chart can be modified without using the user interface on the first website.

70.     Upon information and belief, Tableau has had knowledge of the '000 Patent and its infringement activities at least as early as August 2017.

71.     Upon information and belief, Tableau also indirectly has infringed and continues to indirectly infringe one or more claims of the '000 Patent under 35 U.S.C. § 271(b) and/or (c). Upon information and belief, Tableau has had knowledge of the '000 Patent at least as early as August 2017. Tableau knowingly induces the direct infringement of the '000 Patent by its customers and end users by directing, instructing, and encouraging them to install, use, sell, or offer to sell the Accused Products. Tableau has actively induced such direct infringement through

22

its contacts with customers thereby providing, *inter alia*, functionality, instructions, user manuals and other documentation and other assistance that have served to facilitate, promote, and/or cause customers to directly infringe at least one claim of the '000 Patent. The Accused Products constitute a material part of practicing at least one of the methods of at least one claim of the '000 Patent, have no substantial non-infringing uses, are not staple articles of commerce, and are specifically made and adapted for use in an infringing manner, as discussed above. Upon information and belief, Tableau has performed the acts that constitute indirect infringement with the knowledge or willful blindness that the resulting acts thereby would constitute direct infringement by customers.

72.     As a direct and proximate consequence of Tableau's infringement of the '000 Patent, iCharts has suffered damages in an amount not yet determined for which iCharts is entitled to relief.

## COUNT 3: INFRINGEMENT OF U.S. PATENT NO. 9,712,595

73.     iCharts incorporates the foregoing paragraphs as if fully set forth herein.

74.     Tableau has, alone or in concert, directly infringed and continues to directly infringe, literally or under the doctrine of equivalents, at least independent claim 1 of the '595 Patent in this District, and elsewhere within the United States by, among other things, making, using, selling, and/or offering to sell the Accused Products.

75.     The Accused Products meet each and every element of at least claim 1 of the '595 Patent in violation of 35 U.S.C. § 271(a).

76.     Tableau maintains "a system for creating interactive charts." For example, the Accused Products allow users to publish dashboards and share interactive visualizations. http://www.tableau.com/products/cloud-bi.

77. The Accused Products include a "memory that stores a chart template." For example, Tableau-controlled servers and computers store in their memory workbooks that Tableau describes as "templates" to create interactive charts.

78. The Accused Products include "a processor, wherein the processor executes instructions stored in the memory, causing the processor to: "generate a user interface on a first website," "receive chart data via the user interface," "receive a selection of the chart template via the user interface," and "generate an interactive chart including the chart data and the chart template." For example, Tableau controlled servers and computers include both a processor and a memory, where the processor executes the Accused Products' instructions stored in the memory to generate a user interface, receive chart data and a selection of a chart template and generate an interactive chart. For example, the instructions for generating a user interface can be part of both the online tools and a desktop tool, of the Accused Products. From the user interface of the Accused Products, the user can view a Data tab that shows multiple sources of chart data. The user is also shown multiple chart templates available for selection by the user. By selecting chart data and a chart template, the user interface allows the user to create an interactive chart.

79. The Accused Products include "a network interface that, in response to generation of the interactive chart, transmits the interactive chart to a second website for display without the execution of the instructions stored in the memory to generate the user interface of the first website, wherein the second website receives an input from a second user and updates the interactive chart after the second website receives the input." For example, the Accused Products provide a network interface that allows users to transmit interactive charts to other websites. Tableau calls this operation "Publish." Once the interactive chart is created, the user can publish the chart using the "Publish" button. The "published" interactive chart can be seen on a second website. By selecting

a zoom function (as shown above), the published interactive chart can be modified without using the user interface on the first website,

80.     Upon information and belief, Tableau has had knowledge of the '595 Patent and its infringement activities at least as early as August 2017.

81.     Upon information and belief, Tableau also indirectly has infringed and continues to indirectly infringe one or more claims of the '595 Patent under 35 U.S.C. § 271(b) and/or (c). Upon information and belief, Tableau has had knowledge of the '595 Patent at least as early as August 2017. Tableau knowingly induces the direct infringement of the '595 Patent by its customers and end users by directing, instructing, and encouraging them to install, use, sell, or offer to sell the Accused Products. Tableau has actively induced such direct infringement through its contacts with customers thereby providing, *inter alia*, functionality, instructions, user manuals and other documentation and other assistance that have served to facilitate, promote, and/or cause customers to directly infringe at least one claim of the '595 Patent. The Accused Products constitute a material part of the computer system, or practice at least one of the methods, of at least one claim of the '595 Patent, have no substantial non-infringing uses, are not staple articles of commerce, and are specifically made and adapted for use in an infringing manner, as discussed above. Upon information and belief, Tableau has performed the acts that constitute indirect infringement with the knowledge or willful blindness that the resulting acts thereby would constitute direct infringement by customers.

82.     As a direct and proximate consequence of Tableau's infringement of the '595 Patent, iCharts has suffered damages in an amount not yet determined for which iCharts is entitled to relief.

## ATTORNEYS FEES

83.     According to 35 U.S.C. § 285, iCharts is entitled to, and respectfully requests, its reasonable attorneys' fees in this case.

## DEMAND FOR JURY TRIAL

84.     According to Fed. R. Civ. P. 38(b), iCharts respectfully requests a trial by jury on all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, iCharts prays for the following relief:

a.      that this Court declare Tableau has directly infringed, and continues to directly infringe, one or more claims of the Asserted Patents under 35 U.S.C. § 271(a);

b.      that this Court declare Tableau has indirectly infringed, and continues to indirectly infringe, one or more claims of the Asserted Patents under 35 U.S.C. § 271(b) or (c);

c.      that this Court award iCharts all damages adequate to compensate it for Tableau's above-mentioned infringements; and that interest and costs be assessed against Tableau according to 35 U.S.C. §§ 154(d) and 284;

d.      that this Court declare Tableau's infringement was and is willful from the time it became aware of the infringing nature of its product, and award treble damages for the period of the willful infringement of the Asserted Patents pursuant to 35 U.S.C. § 284;

e.      that this Court declare this an exceptional case and order that Tableau pay iCharts its reasonable attorneys' fees and costs according to 35 U.S.C. § 285;

f.      that Tableau, its officers, directors, agents, servants, employees, attorneys, affiliates, divisions, branches, parents, and those persons in active concert or participation with any of them, be permanently restrained and enjoined from directly or indirectly infringing the Asserted Patents; and

g.      that iCharts be awarded such other and further relief as this Court may deem just

and proper.

October 10, 2023                                Respectfully submitted,


By: */s/ Michael P. Adams*

Michael P. Adams (Local Counsel)
Texas State Bar No.: 00872050
Madams@dykema.com
**DYKEMA GOSSETT PLLC**
111 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone: (512) 703-6315
Facsimile: (855) 256-1484

Fabio E. Marino (Lead Attorney) *
California Bar No.: 183825
**WOMBLE BOND DICKINSON (US) LLP**
1279 Oakmead Parkway
Sunnyvale, CA 94085
T:  408-720-3436
Email: Fabio.Marino@wbd-us.com

Steven M. Levitan **
California Bar No.: 148716
Carrie J. Richey **
California Bar No.: 270825
Daniel M. Grigore **
California Bar No.: 347602
**WOMBLE BOND DICKINSON (US) LLP**
50 California Street, Ste. 2750
San Francisco, CA 94111
T:  415-765-6240
Emails:
Steve.Levitan@wbd-us.com
Carrie.Richey@wbd-us.com
Daniel.Grigore@wbd-us.com

**ATTORNEYS FOR PLAINTIFF**
**iCHARTS LLC**


*Admission to the Western District of Texas anticipated
** Admission Pro Hac Vice anticipated

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 10, 2023, I caused to be electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record *via* email.

By:   *Michael P. Adams*
       Michael P. Adams