UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ICHARTS LLC,

        Plaintiff,

      v.

TABLEAU SOFTWARE, LLC,

        Defendant.

No.  C 24-03157 WHA

**ORDER RE MOTION FOR JUDGMENT ON THE PLEADINGS**

## INTRODUCTION

In this patent case, defendant moves for judgment on the pleadings that the three asserted patents claim ineligible subject matter.  For the reasons below, the motion is **GRANTED.**

## STATEMENT

Plaintiff's predecessor, iCharts, Inc., was founded in 2008 to help users create and share interactive charts online.  It adopted a distribution model from online videos and user conventions for interactive online charts that others had demonstrated.  And, as its patent specifications acknowledge, its asserted advance over preexisting interactive online charts — making them also "self-contained" — was achieved using conventional tools for making interactive online media self-contained (*infra*).  The essence of the specified advance was to apply tools having off-the-shelf features for making interactive media to this instance of making interactive media that happened to be charts.  When asked again post-argument, patent owner could find no statement in the specifications or claims plausibly suggesting that applying these features to this use case was anything but conventional (*infra*).  Finally, while

United States District Court
Northern District of California

United States District Court
Northern District of California

the discussion of those existing tools takes place in the specifications, no independent claim is limited even to that mechanism for achieving self-contained interactivity (*infra*).  Same goes for all dependent claims but two, only one of which iCharts even cites (in a single sentence), and those two are limited to that conventional mechanism (*infra*).  To complete the picture:

YouTube provided a preexisting distributional model for online media:  One user made a video, the same or a second user embedded it on another website, and still others interacted with it there (Compl. ¶¶ 16, 20).  iCharts, Inc. tried doing the same, but for charts rather than video; it aimed to become the "YouTube for interactive charts" (*id.* ¶ 20).

Google Spreadsheets demonstrated preexisting conventions for creating and sharing interactive charts online:  Users logged onto Google Spreadsheets's portal, combined their data with chart templates, generated interactive charts, embedded those charts on other websites, and interacted with those charts by mousing over them to reveal data details, for example (*see* U.S. Patent No. 8,271,892, col. 1 ll. 28–44).  iCharts, Inc. adopted the same basic conventions for charts with one purported improvement further below (*see ibid.*; Compl. ¶¶ 18, 21).

Finally, Adobe Flash, Microsoft Silverlight, and other programs "having similar features" provided preexisting tools that were "configured to create" interactive multimedia that was also "self-contained" (*see* '892 patent, col. 10 ll. 7–16).  Adobe Flash supported packaging code, data, and readymade features into digital objects that upon user input changed what was displayed without needing a distant server to provide further code or data.  This capability already "was conventionally used to display multimedia," including on websites (*see* Compl. ¶¶ 23–24; Tr. 24; '892 patent, col. 2 ll. 12–14, col. 9 ll. 51–54, 63–65, col. 10 ll. 7–16).  And, it was used to display multimedia in other compatible environments, such as in the PDF viewer Adobe Reader ('892 patent, col. 10 ll. 7–12).  iCharts, Inc. used these tools to make Adobe Flash objects that were interactive, self-contained, and — in its case — charts (*see ibid.*; Compl. ¶¶ 23–24, 41–42).

The same year as its founding (2008), iCharts, Inc. began applying for patents on systems and methods for creating, generating, and sharing interactive, self-contained charts.  The claimed advance over Google Spreadsheets's interactive charts was what Adobe Flash already

had made possible.  Before, when users interacted with Google's charts, Google's servers rendered changes to the charts ('892 patent, col. 1 ll. 35–44).  As now specified, when a user interacts with charts, the user's computer renders changes to the charts — made possible because those interactive charts, like other interactive media before, are now packaged as Adobe Flash objects containing code, data, and readymade features to render changes (*see, e.g.*, Compl. ¶¶ 41–42 (citing '892 patent, col. 9 ll. 51–54, 62–65, col. 10 ll. 7–11)).  (As analyzed further below, the two (dependent) claims that recite anything like a mechanism for the advance recite that a "flash" file type be used.)  The claims are captured in the '892 patent (Compl. ¶¶ 33–44, 53–63), its continuation-in-part, U.S. Patent No. 8,520,000 (Compl. ¶¶ 45–49, 64–72), and the latter patent's own continuation, U.S. Patent No. 9,712,595 (Compl. ¶¶ 50–52, 73–82).

Defendant Tableau Software, LLC also helps users create, publish, and embed interactive charts into websites (*id.* ¶¶ 9–11).  It allegedly has been using iCharts, Inc.'s claimed inventions since at least 2010 (*id.* ¶¶ 12, 30).  Tableau considered but chose not to acquire iCharts, Inc. even after Tableau became aware of iCharts, Inc.'s patent portfolio in 2017 (*id.* ¶ 32).  iCharts, Inc. filed for bankruptcy in 2018 (Dkt. No. 61 at 2).  Plaintiff iCharts LLC is now the assignee of the patents (Compl. ¶¶ 33, 45, 50).

In 2023, plaintiff iCharts LLC ("iCharts" from here on) brought this action asserting the above three patents against Tableau (Compl. at 1).  The suit was filed in the Western District of Texas (*ibid.*).  Tableau counterclaimed, seeking declaratory relief that all patents in suit were invalid or not infringed (Dkt. No. 18 at 17–23).  In 2024, the case was transferred to this district (Dkt. No. 61).

Now, Tableau moves for judgment on the pleadings, arguing that the patents are directed to abstract ideas and lack inventive concepts, and so are ineligible for patenting (Br. 1).  This is the first substantive order in this case.  It follows briefing, argument, and supplemental briefing.

United States District Court
Northern District of California

3

United States District Court
Northern District of California

**ANALYSIS**

**1.    THE LEGAL STANDARDS.**

"Patent eligibility can be determined on the pleadings," *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018), even on the basis of representative claims, *Berkheimer v. HP*, 881 F.3d 1360, 1365 (Fed. Cir. 2018), *cert. denied*, 140 S. Ct. 911 (2020).

**A.    RULE 12(C): JUDGMENT ON THE PLEADINGS.**

"[J]udgment on the pleadings is properly granted only when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1068 (9th Cir. 2020) (cleaned up). In the patent context, pleadings include complaint and patent. *IBM Corp. v. Zillow Grp., Inc.*, 50 F.4th 1371, 1379 (Fed. Cir. 2022); *cf. Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (clarifying notice limits). And, construing the pleadings includes, as needed to decide the issue, constructing any claim language and construing any underlying factual assertions in the specification or complaint in favor of the non-movant. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125, 1127–30 (Fed. Cir. 2018) (on Rule 12(b)(6)); *AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379–80 (Fed. Cir. 2024). A complaint cannot save the patent simply by contradicting the specification or claim language, however. *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1358 (Fed. Cir. 2024). And, if the claim language surpasses patent-eligible bounds, not even the specification's assertions can confine and save the claims, *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766, 769 (Fed. Cir. 2019), *cert. denied*, 140 S. Ct. 983 (2020); *Intell. Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1322 (Fed. Cir. 2016); *Zillow Grp.*, 50 F.4th at 1379; *AI Visualize,* 97 F.4th at 1380, as further described next.

**B.    SECTION 101: PATENT ELIGIBILITY UNDER ALICE.**

Patent eligibility turns on "what type of discovery" is claimed. *Parker v. Flook*, 437 U.S. 584, 593 (1978). Eligibility is limited to "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Implicitly excluded are laws of nature, natural phenomena, and abstract ideas. *Mayo Collab.*

1    *Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 70 (2012).  Patenting mere abstractions, where it

2    "matters not by what process or machinery the result is accomplished," would "shut[] the door

3    against inventions."  *O'Reilly v. Morse*, 56 U.S. 62, 113 (1853).  And so, while a test for the

4    "type" of discovery, "the underlying functional concern here is a *relative* one:  how much

5    future innovation is foreclosed relative to the contribution."  *Mayo*, 566 U.S. at 88.

6         A two-step inquiry governs.  *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217–18

7    (2014).  At step one, we consider whether a claim is directed to, as asserted here, an abstract

8    idea.  *Id.* at 217.  If so, at step two, we consider whether the claim nonetheless contains an

9    "inventive concept" sufficient to "'transform the nature of the claim' into a patent-eligible

10   application" of that idea.  *Id.* at 217–18 (quoting *Mayo*, 566 U.S. at 78)*.*

11        "In cases involving software innovations, [the step-one] inquiry often turns on whether

12   the claims focus on specific asserted improvements in computer capabilities . . . ."  *Uniloc*

13   *USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1306 (Fed. Cir. 2020).  If the claims focus

14   only on a desirable result in computing but not how to achieve it, they are directed to an

15   abstract idea.  *Id.* at 1308*.*  And, if they focus even more generically on a longstanding practice

16   or other "process or system that qualifies [as] an abstract idea for which computers are invoked

17   merely as a tool," they are directed to an abstract idea.  *Id.* at 1306.

18        The step-two inquiry then turns on whether the claim elements, alone or in combination,

19   transform the nature of the claims into a "specific implementation," with that "specificity

20   [being] as to the mechanism through which the[ claims] achieve improved results."  *Weisner v.*

21   *Google LLC*, 51 F.4th 1073, 1085 (Fed. Cir. 2022).  Said another way, not every "specific

22   implementation" suffices:  The Supreme Court has repeatedly "rejected the argument that

23   'implement[ing] a principle in some specific fashion' will 'automatically fal[l] within the

24   patentable subject matter of [Section] 101.'"  *Alice*, 573 U.S. at 222 (first two alterations

25   original) (quoting *Flook*, 437 U.S. at 593).  No transformation results, for instance, from

26   "specifying" that the site of implementation is the Internet, computers, or a file type.  *See ibid.*

27   (citing *Bilski v. Kappos*, 561 U.S. 593, 610–611 (2010)); *see also Intell. Ventures I LLC v.*

28   *Cap. One Fin. Corp.*, 850 F.3d 1332, 1340 (Fed. Cir. 2017).  Nor does a transformation result

United States District Court
Northern District of California

1   from "specifying" that the mechanism of "improvement" is conventional, such as "computers

2   [doing] merely what computers do." *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716–17

3   (Fed. Cir. 2014), *cert. denied*, 576 U.S. 1057 (2015). Instead, the claim must include

4   "additional features," *Mayo*, 566 U.S. at 77, steps that "override[] the routine and conventional

5   sequence," *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1258 (Fed. Cir. 2014), or

6   otherwise amount to "significantly more" than a "drafting effort designed to monopolize the

7   [abstract idea]," *Mayo*, 566 U.S. at 77, 79–80.

8                              *C.    REPRESENTATIVE CLAIMS.*

9         The district court need not analyze a patent's every claim. It "may treat a claim as

10  representative in certain situations, such as if the patentee does not present any meaningful

11  argument for the distinctive significance of [other] limitations." *Berkheimer*, 881 F.3d at 1365.

12            **2.    THE CHALLENGED PATENTS.**

13        Tableau contends that all three patents in suit — the '892 patent and its continuations-in-

14  part, the '595 and '000 patents — are directed to the idea of "generating then transmitting an

15  interactive chart while retaining its interactivity" and lack inventive concept (Br. 1).

16        This order begins by reiterating the largely overlapping specifications to shed light on the

17  "claimed advance over the prior art," as claim limitations related to that advance can indicate

18  whether a "claim's character as a whole is directed to ineligible subject matter." *AI Visualize*,

19  97 F.4th at 1378. Again, the overlapping specifications acknowledge preexisting conventions

20  and tools: Google Spreadsheets combined user-inputted data with chart templates to create and

21  share interactive charts online ('892 patent, col. 1 ll. 28–45). And, Adobe Flash, Microsoft

22  Silverlight, and other programs offered tools for making self-contained interactive media (*see

23  id.*, col. 2 ll. 12–14, col. 10 ll. 7–15; Compl. ¶¶ 23–25; Tr. 24). Websites, web browsers, and

24  other applications — even PDF readers like Adobe Acrobat Reader — provided support for

25  embedding and rendering resulting Adobe Flash objects (*see* '892 patent, col. 9 ll. 63–65, col.

26  10 ll. 7–15). Of course, the specifications assert an advance: Improving upon the interactive

27  charts of Google Spreadsheets by using the interactive multimedia tools of Adobe Flash, and

28  thereby creating interactive charts that are also self-contained (*see ibid.*; *id.* at col. 1 ll. 35–44).

To borrow iCharts's summary: Shifting from Google Spreadsheets's "server-side rendering" of charts to iCharts's "[c]lient-side re-rendering" of charts was "the leap" the invention claimed (Tr. 23). And "[Adobe] Flash [was the] tool that our inventors used" to take that leap (*id.* at 24).[1] Tableau argues that these concessions eliminate any scope for a patent-eligible invention: Adobe Flash is simply a conventional tool conventionally applied to achieve the abstract idea (Tr. 25–26). iCharts opposes by stating that the invention adds functionality, but iCharts does not specify what functionality is added and where the specification, let alone the claims, plausibly says so (Opp. 1–2, 21–22). In post-argument briefing, Tableau cites eight separate passages in the overlapping specifications supporting its views that Adobe Flash (and Microsoft Silverlight) offered a conventional mechanism for making interactive multimedia self-contained (Supp. Br. §§ 1–3). iCharts remains unable to point to a single line supporting its view that the inventors improved Adobe Flash or used Adobe Flash in any way unconventionally (Supp. Opp. §§ 1–3). Indeed, the specification describes using a "flash file" that packages data and code to to render the chart, obtain input from the user, and re-render the chart ('892 patent, col. 9 ll. 51–54). And, Adobe Flash already "[wa]s configured to create such a file" (*id.* at col. 10, ll. 12–15; '595 patent, col. 8 ll. 66–67, col. 9 ll. 1–2); *see also* Opp. 21 (not pointing to other language in response to this point)). It is not plausible to read such passages as touting what was invented. They explain what conventional tool was applied to this use case. *See Beteiro*, 104 F.4th at 1358.

Ultimately, although this order started with the specifications to shed light on the asserted advance, *see AI Visualize*, 97 F.4th at 1378, the specifications cannot supply eligibility-saving limitations not in the claims, *ChargePoint*, 920 F.3d at 766, 769; *Symantec*, 838 F.3d at 1316.

This order thus turns to the decisive claim language. Notably, iCharts itself lumps together its arguments addressing the '892, the '595, and the '000 patents — and mistakenly cites an "'895 patent" (Opp. 21). Perhaps all claims in this family can be addressed so readily

---

[1]  The exact terms "client-side rendering" and "server-side rendering" do not appear in the claims or specifications, though all agree they encapsulate other express language there and fairly characterize the asserted advance (*see* Supp. Br. § 4; Supp. Opp. § 4).

by one set of arguments. This order more cautiously proceeds patent-by-patent, considering one claim for each.

### A.   THE '892 PATENT.

This order starts with the '892 patent, treating claim 1 as representative. The complaint specifically alleged infringement only of claim 1 (Compl. ¶¶ 44, 54–55). And, iCharts's opposition only argues about claim 1 (*see* Reply 1). Although iCharts mentions three dependent claims in two sentences, it does not develop arguments based on them (*see* Opp. 14). This order re-examines this choice at the end.

What is claimed is:

> **1.** A computer system comprising:
> a *data module* configured to store data;
> a *chart template module* configured to store chart templates;
> a *generation module* configured to generate an interactive chart on
>     a generation interface,
>     wherein the generation interface is configured to enable a user
>         to generate the interactive chart from data stored in the data
>         module and a template from the chart template module;
> a *sharing module* configured to enable a user to publish or embed
>     the interactive chart as a self-contained and independent
>     electronic document,
>     wherein the *self-contained and independent interactive chart*,
>         when opened in a program in the absence of the generation
>         interface and the chart template module, enables a user to
>         a) render the chart, b) obtain input from a user and c)
>         rerender the chart using the input as a parameter thereby
>         enabling the interactive chart to retain interactivity when
>         published or embedded.

('892 patent, col. 18 ll. 32–52 (emphases added)). Thus, the claimed invention is a computer system having modules for data and templates, another for generating charts from the first two, and a final one for sharing the charts — such that the charts are self-contained and interactive.

### (i)   Alice *Step One.*

The claim is directed towards the abstract idea of generating and sharing self-contained, interactive charts on computers. Standard indicators of abstraction support this conclusion. *See Beteiro*, 104 F.4th at 1355–57.

*Above all*, "a claim that merely describes an effect or result dissociated from any method by which it is accomplished" is generally "not directed to patent-eligible subject matter."

8

*Zillow Grp.*, 50 F.4th at 1378 (cleaned up). Here, this is true especially considering the "limitations that are purported to describe the claimed advance." *AI Visualize*, 97 F.4th at 1378. The claim language repeats the purported advance as a "self-contained and independent interactive chart" ('892 patent, col. 18 ll. 46–47). Such a chart "enabl[es] the user" to "render" and "rerender" the chart "in the absence of the generation interface" (*id.* at col. 18 ll. 47–52; *cf. id.* at col. 9, ll. 50–54). But these limitations recite criteria for success, not "specific and concrete technological advance[s]" for how to achieve success. *Adasa Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022), *cert. denied*, 143 S. Ct. 2561 (2023). Such "result-based functional language," particularly as to the purported advance, indicates that the claim is directed to an abstract idea. *See Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017), *cert. denied*, 586 U.S. 945 (2018).

"*Furthermore*, with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human." *Symantec*, 838 F.3d at 1318 (emphasis added). In *Zillow Group*, for example, claims to a method of "responding to a user's selection of a portion of a displayed map by simultaneously updating the map" compared readily to what human cartographers could have done using layered transparencies, wet-erase markers, and other tools without computers, indicating the claims were directed to an abstract idea. 50 F.4th at 1377–78 (quoting district court); *see also id.* at 81–82. Here, this claim for creating a chart, sharing a chart, then rendering changes to the chart in the absence of the thing that created the chart is likewise readily compared to examples beyond computers: For decades, videogame makers have created interactive charts and loaded them onto videogame cartridges for playing (*see* Tr. 4). For millennia, cartographers have created navigational charts, or maps, that can be folded to focus on just one area or opened to show all areas (*see id.* at 5). That a claim so readily analogizes to interactive charts of all kinds reinforces that it is directed to an abstract idea, applied here with computers. *Zillow Grp.*, 50 F.4th at 1377–78, 81–82; *Beteiro*, 104 F.4th at 1356–57.

None of iCharts's arguments persuade otherwise.

*First*, iCharts argues that the patent is not merely a "do it on a computer" patent, but one directed to a problem in computing: "[T]he instant claims are rooted in technology *because* they require an electronic 'self-contained and independent interactive chart' that allows the user to interact with the chart after it has been shared over the Internet" (Opp. 13 (emphasis added) (citing '892 patent, col. 18 ll. 46–47). As an initial point, the argument imagines limitations not in the claim or claims. "[T]he Internet" is nowhere to be found in *any* claim in this patent (*see* '892 patent, cols. 18–20), with "remote server" about as close as it comes (*id.* at col. 19 ll. 19). The analysis must stay "[]tethered" to the claim language. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1337 (Fed. Cir. 2016). And, the argument misses the point (often made at step two) that an abstract idea does not become "rooted in technology" *because* claim elements limit its use to a contemporary environment, whether "the Internet," "electronic" documents, or a single file type. *See, e.g.*, *Alice*, 573 U.S. at 222 (computers); *Cap. One*, 850 F.3d at 1340 (XML files).

*Second*, iCharts argues that the patent is directed to a specific solution because it recites "concrete steps and structures" like "data module," "chart template module," and "generation module" (Opp. at 13–14 (quoting '892 patent, col. 18 ll. 33–34, 39–42)). But if those catch phrases amount to anything but printed text, it is because they call to mind existing conventions for the ordinary artisan, like the ones the specification states were used by Google Spreadsheets. *See Adasa Inc.*, 55 F.4th at 908; *cf. Cap. One Fin. Corp.*, 850 F.3d at 1342 ("coined labels" at step two).

*Third*, iCharts argues that the claim is directed to more than abstract results because, when read in light of the specification, it really claims a mechanism (Opp. 16–17). But even while making that argument, iCharts wholly fails to cite to any particular mechanism in the specification, let alone any in the claim language (*see ibid.*; *see also id.* at 21 (similarly failing to rebut Tableau's extensively cited arguments with any citations of its own)). This is not a close call; in any case, similar arguments will be examined more deeply at step two. *Cf. Enfish, LLC*, 822 F.3d at 1339.

10

1      *Finally*, iCharts states that the claim is directed towards a specific invention because the

2      claims require "using a self-contained file that is independent of the web portal in which it is

3      created" (Opp. 12 (citing '892 patent, col. 10 ll. 7–8)).  But that is the abstract idea.

### (ii)    Alice *Step Two.*

5      At step two, no inventive concept saves the claim.

6      *Above all*, the Federal Circuit has repeatedly held that when further inspection at step two

7      shows "'the *mechanism* is not described, although this is stated to be the essential innovation,'

8      then the claim is not patent-eligible."  *Symantec*, 838 F.3d at 1316 (emphasis added) (cleaned

9      up) (quoting *Internet Pats. Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir.

10     2015)).  Searching even more deeply than at step one for a mechanism that makes the

11     interactive chart self-contained, we find circular limitations with no mechanism:  The claim

12     tells us to use "a *generation* module configured to *generate* an interactive chart" ('892 patent,

13     col. 18 ll. 37–38), and to use "a *sharing module* configured to enable a user to publish or

14     embed," that is, share, "the interactive chart *as* a self-contained" one (*id.* at col. 18 ll. 43–44).

15     Such circularly claimed "modules" are not specifically claimed mechanisms.  They are

16     whatever "module[s]" achieve the stated results — whether the mechanisms are conventional

17     or fantastical — and cannot render the claim eligible for patenting.  *Morse*, 56 U.S. at 113.

18     That these modules must be ones "configured to" achieve desired results does not change the

19     analysis.  The statement at most "instruct[s] the practitioner to implement the abstract idea with

20     routine, conventional activity" to achieve the results.  *See Ultramercial*, 772 F.3d at 715.

21     "Steps that [at best] do nothing more than spell out what it means to 'apply it on a computer'

22     cannot confer patent-eligibility."  *Intellectual Ventures I LLC v. Cap. One Bank (USA)*, 792

23     F.3d 1363, 1370–71 (Fed. Cir. 2015) (citing *Alice*, 573 U.S. at 224–25).

24     We reach the same conclusion when we inspect other claim elements individually or as

25     an ordered combination, as *Alice* teaches more generally.  *See Weisner*, 51 F.4th at 1085.

26     *As individual components*, nothing "override[s]" convention.  *DDR*, 773 F.3d at 1257–58.

27     The claims recite a structureless "data module," "chart template module," and "generation

28     module" ('892 patent, col. 18 ll. 34–37).  As claimed, they are indistinguishable from the

United States District Court
Northern District of California

11

conventions said to be in use by Google Spreadsheets (*see infra*).  "The mere fact that the inventor applied coined labels to conventional structures," if the inventor did even that much, "does not make the underlying concept inventive."  *Cap. One Fin. Corp.*, 850 F.3d at 1342.

*As an ordered combination*, nothing "override[s]" the convention for generating, sharing, and interacting with charts to create eligibility, either.  *See DDR*, 773 F.3d at 1257–58.  Google Spreadsheets, for example, already demonstrated conventions for users to "enter data in an online spreadsheet," "select a chart type," "generate[] the interactive chart" from the "highlight[ed]" data and "select[ed]" chart type, "embed[ the chart] in online pages," and "interact[ with its] features" (*see* '892 patent, col. 1 ll. 28–44).  Here, the sequence is identical: A "data module" stores data; a "chart template module" stores charts; a "generation" module "generate[s] the interactive chart" from "data stored in the data module and a template from the chart template module"; a "sharing module" enables the user to "embed" the chart; and the user interacts with the chart (*id.* at col. 18 ll. 34–52).  Furthermore, even the steps of "render[ing]," "obtain[ing] input," and "rerender[ing] the chart using the input" follow conventions for interactions as such, as well as for the type of file Adobe Flash was "configured to create" (*see* '892 patent, col. 9 ll. 51–54, col. 10, ll. 12–15).

*Finally*, the only limitation in the claims not yet addressed is the abstract idea itself, artfully rearticulated:  The chart must remain interactive "in the absence of" the generation interface (*id.* at col. 18 l. 47).  "It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."  *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290 (Fed. Cir. 2018).

In response, iCharts seeks to analogize its claims to those held eligible in *DDR*, then to conjure from the complaint facts that are not reasonably disputed in the intrinsic record nor material to the claim language.  The arguments do not persuade.

*First*, iCharts begins by relitigating whether the claim is directed toward solving a problem specific to computers (*see* Opp. 19–20).  It is not.  In *DDR*, the patent was directed towards solving a problem the Internet created in online marketing with no analogue in offline

United States District Court
Northern District of California

marketing. 773 F.3d at 1258. But here, despite the specification's efforts to root the '892 patent in a computing-specific problem, the claim language generically addresses a problem that readily analogizes to hand-powered chart-making of all kinds: Humans have always made and shared self-contained, interactive charts (*supra*). Limiting this idea to a site of recent relevance cannot itself render the claim eligible. *Ultramercial*, 772 F.3d at 716 (Internet); *Alice*, 573 U.S. at 222 (computers); *Cap. One Fin. Corp.*, 850 F.3d at 1340 (XML files). iCharts similarly argues that the patent nevertheless describes a specific solution, now in computers (Opp. 20–22). *DDR* is again instructive: There, the patent recited specific steps on computers "overrid[ing] the routine." 773 F.3d at 1257–58. Not here (*supra*).

> *Second*, iCharts contends that its published invention "took three years for Tableau to replicate" (Tr. 20; *see* Opp. 22; Supp. Opp. 4–5), an assertion not in the complaint and indeed contradicted by it (*compare* '000 patent (2008 priority, 2010 prior publication), *with* Compl. ¶ 30 (2010 infringement), *and id.* ¶ 70 (at least as early as 2017 knowing infringement)). Even assuming the newly presented timeline true, so what? Does iCharts mean to imply that its patent is invalid rather than ineligible (because it did not reduce or enable what it claims), as if an invalid claim could not as a prior matter also be an ineligible one? Whatever the point, iCharts's eligibility problem is not solved by Tableau's purported timeline to infringement — not logically, not legally, and not on this record. Legally, a patentee must pass each test in the statute: Even if an invention would later be found novel, nonobvious, reduced, and enabled (or not), it is not eligible for patenting if directed to an abstract idea and without inventive concept. *Diamond v. Diehr*, 450 U.S. 175, 188–89 (1981); *Symantec*, 838 F.3d at 1315. Moreover, on the intrinsic record, no plausible inference can be drawn except that Adobe Flash was a conventional tool conventionally applied. *See Beteiro*, 104 F.4th at 1357–58 (reasoning similarly as to GPS). Adobe Flash, Microsoft Silverlight, and other programs were "configured to create" what was required, with out-of-the-box "features" to apply to this use case involving charts (*see* '892 patent, col. 10, ll. 12–15). In rebuttal, iCharts pointed to no contrary citations in the specification or claims (*see* Opp. 1–2, 21–22; Supp. Opp.).

*Third*, even surpassing plausibility to assume Adobe Flash was not conventionally used, the claim language does *not* limit this claim to using Adobe Flash or to *any* mechanism by which its ideas are accomplished (*supra*).  That failure is fatal.  *See ChargePoint*, 920 F.3d at 766, 769 (claims control); *Internet Pats.*, 790 F.3d at 1348 (lack of mechanism in claims fatal); *Symantec*, 838 F.3d at 1322 (lack of inventive concept in claims).  Only dependent claim 4 even approaches reciting a mechanism by stating that the interactive chart comprises a "flash object."  Again:  "Flash [wa]s not the invention" (Tr. 24).  *See also Cap. One Fin. Corp.*, 850 F.3d at 1340, 1342 (neither limitation to environment of XML files at step one, nor purported but not specifically claimed modification of XML files at step two, sufficed to save patent).

In sum, despite the efforts of "the draftsman's art" to suggest otherwise, the patent does not disclose an inventive concept at step two.  As a result, claim 1 of the '892 patent is not patent eligible.  And, because iCharts "does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim," the entire '892 patent is not eligible.[2]  *Berkheimer*, 881 F.3d at 1365.

### B.   THE '595 PATENT.

Tableau also challenges the eligibility of the '595 patent.  The patent again relates "to the creation, sharing[,] and embedding of interactive charts" ('595 patent, col. 1 ll. 22–24).  Recall that its specification almost entirely conforms to that of the '892 patent (*supra*), and that iCharts does not argue that any distinctions make a difference.  For the same reasons stated as to the last patent, this order begins by treating claim 1 as representative here (*compare supra*, *with* Compl. ¶¶ 52, 74–75).

What is claimed is:

**1.** A *system* for creating interactive charts, the system comprising:

---

[2]  As for other claims, iCharts states only that:  "For example, dependent claim 4 provides the self-contained file may be a 'flash object.'  Dependent claims 6-7 claim specific interactive features" (Opp. 14 (citations omitted)).  These limitations do not change the claims' direction away from patenting an idea, nor contain any inventive concept.  Those were existing conventions for implementing the abstract idea (claim 4, as just discussed) or appended limitations (claims 6–7).  *See Beteiro*, 104 F.4th at 1358.  And, other limitations present in other claims of the '892 patent, which iCharts does not discuss, such as those in claim 10, appear in and yet ultimately fail to save the eligibility of other claims considered below, such as claim 1 of the '000 patent.

United States District Court
Northern District of California

memory that stores a *chart template*;
a processor, wherein the processor executes instructions stored
    in the memory, causing the processor to:
    generate a user interface on a first website,
    receive *chart data* via the user interface,
    receive a selection of the *chart template* via the user
      interface, and
    *generate an interactive chart* including the chart
      data and the chart template; and
a *network interface* that, in response to generation of the
    interactive chart, transmits the interactive chart to a second
    website for display without the execution of the instructions
    stored in the memory to generate the user interface of the
    first website, wherein the second web site receives an input
    from a second user and updates the interactive chart after
    the second website receives the input.

('595 patent, col. 18 ll. 41–59 (emphases added)).

### *(i)*      Alice *Step One.*

The claim is again directed to the abstract idea of generating and sharing self-contained, interactive charts, now across websites. Standard indicators of abstraction again dominate. *See Beteiro*, 104 F.4th at 1355–57.

*Above all*, the claim limitations recite results, not *how* to achieve them. *See Zillow Grp.*, 50 F.4th at 1378. Start with the asserted advance. *AI Visualize*, 97 F.4th at 1378. The limitations teach that a user must be able to interact with a chart on a second website "without" anything happening on the first. But that is no more concrete than the "in the absence of" limitation in the last patent. It recites a measure of success, not a means for how to succeed. The other limitations recite conventional components, from "memory" to "processor" to "website." The recitation of results and mere conventional components indicates the claim is directed to an abstract idea. *See Two-Way Media*, 874 F.3d at 1337.

*And*, looking past the generically recited computing parts, the claim is again so broad it captures longstanding practices in generating and sharing self-contained, interactive charts. The same examples above continue to meet the limitations here, once the conventional computing parts are stripped away (*see supra*). This reinforces that the claim is directed to an abstract idea, applied here using conventional computers on the Internet. *Beteiro*, 104 F.4th at 1356–57.

iCharts barely tries to persuade this order otherwise.

15

*First*, iCharts takes time to explain how this claim's many elements, despite their clever new wordings, merely repeat the elements of the '892 patent, relaying "the same concept of an interactive chart" that is created and then shared (Opp. 14, 20). That underscores *Alice*'s concern about the draftsman's art. *See Cap. One Bank (USA)*, 792 F.3d at 1370–71 (step two).

*Second*, iCharts emphasizes that what *does* distinguish this claim from the one above is that this claim has a "network interface" and a "first" and "second website" (Opp. 14). That distinction says more about the total abstraction of the '892 patent claim than about any specificity in the '595 patent. *See Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1092–93 (Fed. Cir. 2019) (citing *Ultramercial*, 772 F.3d at 715), *cert. denied*, 140 S. Ct. 954 (2020). Limiting the claim to websites cannot save the claim. *See Alice*, 573 U.S. at 222 (step two).

### (ii)    Alice *Step Two.*

No inventive concept saves the claim at step two, even after digging for one:

*First*, this claim again discloses no mechanism for making the chart update on the second website "without" accessing resources from the first, "although this is stated to be the essential innovation." *See Internet Pats.*, 790 F.3d at 1348; *see also Symantec*, 838 F.3d at 1316. *Second*, the claimed sequence of elements does not upset the conventional sequence of generating, sharing, and interacting with charts (*cf.* Opp. 14 (acknowledging similarity of sequence between this claim and the claim analyzed *supra*)). Compared to the last claim, this sequence is now elaborated with subroutines like "stor[ing]," "execu[ting]," "caus[ing]," and *then* "generat[ing]" (*compare* '892 patent, col. 18 ll. 37–38, *with* '595 patent, col. 18 ll. 44–46). But these subroutines are equally conventional, formless, and unable to transform the nature of the claims into something patent eligible. *See, e.g.*, *Ultramercial*, 772 F.3d at 715–16. *Finally*, each claim element is again generic. The components of "memory," "processor," and even "user interface," for example, have no structure or limitations apart from the results they perform. If they mean anything, they owe their meanings to conventions. (Even those references are open-ended, as the specification suggests the "user interface" can sometimes be two interfaces (*see* '595 patent, col. 8 ll. 7–16, col. 10 ll. 41–50; *see also id.* col. 18 ll. 43–44, 46).) In short, the claim contains *no* mechanism for doing the work, then appends generic

16

United States District Court
Northern District of California

1    components that would foreclose nearly any implementation for actually doing the work.  Such

2    a claim is not patent eligible.  *See Morse*, 56 U.S. at 113; *Internet Pats.*, 790 F.3d at 1348;

3    *Data Engine*, 906 F.3d at 1008.

4         iCharts's arguments are unavailing.  As an initial point, iCharts's arguments about this

5    '595 patent at *Alice*'s second step can barely be distinguished from its arguments about the

6    '892 patent at *Alice*'s second step.  iCharts even cites the "'895 patent"— as if the two were

7    one (*see* Opp. 21).  The arguments fare no better a second time.  *See also Enfish*, 822 F.3d at

8    1337.

9         *First*, iCharts points to the *complaint*'s assertions that the patent's solution was

10   unconventional (Opp. 22 (citing Compl. ¶¶ 51–52)).  iCharts argues the invention requires

11   using Adobe Flash in unconventional ways to achieve unconventional results (*see ibid.*).  That

12   portion of the complaint states that the '595 patent's claim was "consistent with the inventive

13   concepts described above, as found in the specifications" (Compl. ¶ 52).  Turning to the

14   specifications, they cannot be squared with iCharts's after-the-fact, ad hoc argument that

15   iCharts improved Adobe Flash or applied it unconventionally, *see Beteiro*, 104 F.4th at 1358,

16   as already discussed above.

17        *Second*, iCharts points directly to the *specification*'s assertions that the prior art had not

18   produced interactive and self-contained *charts*, as opposed to multimedia (*see* Opp. 21).  But

19   that misses the point of the patent-eligibility inquiry.  Novelty and non-obviousness are set out

20   in other sections of the statute for a reason:  They are not the test for "determining whether the

21   subject matter of a claim falls within the [Section] 101 categories."  *Diehr*, 450 U.S. at 188–89;

22   *accord Symantec*, 838 F.3d at 1315.  As relevant to Section 101, the specification at best

23   explains that conventional multimedia tools may be applied to this use case:  charts (*see, e.g.*,

24   '595 patent, col. 8 ll. 60–67, col. 9 ll. 1–2).  *Cf. Beteiro*, 104 F.4th at 1358.  iCharts was unable

25   to show otherwise by citation to the specification (*see supra*), much less by citation to the

26   claim language.

27        *Finally*, trying to point to *claim language* evincing an inventive concept in this patent,

28   iCharts argues that the "without" limitation is inventive (*see* Opp. 20).  Really?  At best, that

United States District Court
Northern District of California

1    limitation artfully restates the abstract idea, which after imperiling the patent at step one cannot

2    safeguard the patent at step two.  *Trading Techs.*, 921 F.3d at 1093.

3         As a result, claim 1 of the '595 patent is not patent eligible.  And, once again, because

4    iCharts "does not present any meaningful argument for the distinctive significance of any

5    [other] claim[s]," the entire '595 patent is not eligible.[3]  *Berkheimer*, 881 F.3d at 1365.

6         **C.    THE '000 PATENT.**

7         Tableau finally challenges the eligibility of the '000 patent.  This patent again relates "to

8    the creation, sharing[,] and embedding of interactive charts" ('000 patent, col. 1 ll. 19–20).

9    Recall that it shares its specification with the '595 patent, just analyzed.  For reasons like those

10   given before, this order begins by treating claim 1 as representative (*compare supra*, *with*

11   Compl. ¶¶ 49, 65–66).

12        What is claimed is:

13            **1.**  A computer-implemented method comprising:
             receiving a selection, on a first website, of at least one interactive
14                chart from a plurality of interactive charts; and
             displaying, in response to the selection the [*sic*] at least one
15                interactive chart embedded in a chart box on a second website,
                 wherein the chart box is a web widget,
16           wherein the at least one *interactive char*t is generated on a
                 *generation interface* configured to allow a user to generate the
17                interactive chart with a *chart template* from a *chart template*
                 *store*,
18           wherein the at least one interactive chart, when displayed on the
                 second website *in the absence of* the generation interface,
19                enables a user to a) render the chart, b) obtain input from a user
                 and c) rerender the chart using the input thereby enabling the
20                interactive chart to retain interactivity,
             wherein the selection is made by *dragging and dropping* the at
21                least one interactive chart from the plurality of charts into a
                 *chart box folder connected to the chart box* such that retrieve
22                code for data feed displays the at least one interactive chart on
                 the first website, and
23           wherein the at least one interactive chart is automatically displayed
                 on the second website using a *data feed* from the first website

24

25   _____

26   [3]  As for other claims, iCharts states only:  "Dependent claim 3 further recites a drag and drop
     feature that allows the interactive chart to be easily created and dependent claims [*sic*] 5 requires
     certain interactive features" (Opp. 14–15).  But just because some dependent claims add a bell and
27   whistle or "narrow[] the scope of protection through additional 'conventional' steps for
     performing the abstract idea," does not mean they "make those claims any less abstract."  *See*
     *Bascom Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1352 (Fed. Cir. 2016).
28   Also, these limitations are like those appended to claim 1 of the '000 patent, addressed next.

to the second website upon the *dragging and dropping* selection.

('000 patent, col. 18 ll. 23–49 (emphases added)).  In broad strokes, this patent combines the system done on a computer in the first patent with the method done on websites in the second, and appends steps specifying how to select charts on one site and send them to the other.  Or, as iCharts blankly states, "The '000 Patent further builds on the concept of publishing interactive charts over the Internet" (Opp. 15).

In its motion briefing and argument, iCharts does not specify what exactly was "buil[t] on the concept of publishing."  The district court scoured the pleadings.  In tension with what was said so far, the shared specification describes embodiments where the published chart is not altogether self-contained, but refreshed from the server so that a change to the original chart propagates onto the webpage displaying the copy of the chart (*e.g.*, '000 patent, col. 8 ll. 37–40, col. 14 ll. 6–22; Compl. ¶ 17 ("[D]ata associated with a chart could be fetched later as a user interacted with a chart.")).  Or, in one "example, the [chart or its] data on the webpage can be updated using a data feed (e.g., RSS feed, Atom Feed, etc.)" ('000 patent, col. 15 ll. 35–37; *cf. id.* col. 8 ll. 43–46).  Displaying multiple charts side-by-side is also contemplated (*id.* at col. 15 ll. 61–64; Compl. ¶ 47)  This order considers whether such changes, to the extent even rendered in the claim language, suffice to make the claim patent eligible.

### *(i)*    Alice *Step One.*

This order ultimately agrees with Tableau that this claim is again directed to an abstract idea — generating and sharing interactive, self-contained charts across websites.

*First*, the claim recites results.  *See Zillow Grp.*, 50 F.4th at 1378.  Take the asserted advance that the interactive charts be self-contained ('000 patent, col. 1 ll. 40–49; *see also* Opp. 20).  *AI Visualize*, 97 F.4th at 1378.  The claim language again recites goals, not how to get there:  The chart must retain interactivity "in the absence of" the generation interface ('000 patent, col. 18 ll. 35–40; *cf.* '892 patent, col. 18 ll. 47–52).  Next, take the capability that interactive charts be published automatically.  The "at least one interactive chart" is selected on the first webpage, then "automatically displayed" on the second (*id.* at col. 18 ll. 46–47).  But those limitations again recite results or conventional steps, not mechanisms.  Such results-

19

based functional language indicate that the claim is directed to an abstract idea.  *See Two-Way Media*, 874 F.3d at 1337.

*Second*, stripping away the conventional computer elements, the claimed steps still analogize to long-standing practices.  That a conventional computer implementation (discussed more *infra*) of the idea now also ensures the chart is "automatically displayed" elsewhere does not stump *Alice*.  *Zillow Grp.*, 50 F.4th at 1377–78, 1381–82.

iCharts does not persuade otherwise.  Rather than specifically analyze the claim elements, iCharts just restates them (*see* Opp. 15).  Then, lumping this claim in with all the claims from the other patents above, iCharts asserts only that all the patents (including this one) are like those held eligible in *McRo* and *Data Engine* (*ibid.*).  Not so.  This order takes each case comparison in turn:

In *McRo*, the patent held eligible at step one entailed a solution for animating lips.  *McRo, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1316 (Fed. Cir. 2016).  What was claimed was an unconventional algorithm of observing phonemes, assigning morph weights as a function of those observations, and rendering animations.  *Id.* at 1307–08, 1314–15.  That solution differed from the approach used by human animators and in fact "differe[d in] structure or . . . techniques" from other approaches foreseeable for computer animation.  *Id.* at 1316 (citing *Morse*, 56 U.S. at 113).  Here, no specific solution was even recited to address the advance.  Instead, what was claimed was whatever "generation module" makes charts that remain interactive "in the absence of" that module.  And, even if preemption concerns are reduced by added limitations like "dragging and dropping," such appended limitations and even an absence of preemption are not enough to redirect the claim towards a concrete advance.  *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015), *cert. denied*, 579 U.S. 928 (2016); *accord OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir.), *cert. denied*, 577 U.S. 1050 (2015); *Symantec*, 838 F.3d at 1321.

And, in *Data Engine*, the patent held eligible at step one was directed to a specific problem in computing:  navigating three-dimensional spreadsheets on computers.  906 F.3d at 1008.  The representative claim "recite[d] precisely th[e] technical solution and improvement

20

in computer spreadsheet functionality." *Ibid.* It required graphical tabs, a user-set label for each tab, and formulae using the labels to perform operations across tabs. *Ibid.* Here, focusing likewise on the limitations to the asserted advance, the claim recites an "interactive chart [that] is generated on a generation interface configured to allow a user to generate the interactive chart," and further recites that when displayed on another website the chart retains its interactivity "in the absence of" the generation interface ('000 patent, col. 18 ll. 34–39). These limitations do not recite a technical solution. Rather, they are more like the claims that *Data Engine* rejected as ineligible, as they at most recite the desired result or "the method of implementing the abstract idea itself [using conventions] and thus fail [even] under *Alice* step two." *See* 906 F.3d at 1012. Other limitations appended to the claim here — e.g., "dragging and dropping" and "data feed" — do not change this result. As *Data Engine* teaches, patent-eligibility turns on the limitations solving the purported problem, not on extraneous limitations opportunistically tacked on by the draftsman's art. *Id.* at 1010–11 (distinguishing *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253 (Fed. Cir. 2016), and *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016)); *see also AI Visualize*, 97 F.4th at 1378.

### (ii)    Alice *Step Two.*

No inventive concept saves the claim at step two.

*First*, the claim discloses no mechanism for making the chart re-render on the second website "in the absence of" the first ('000 patent, col. 18 ll. 34–39), "although this is stated to be the essential innovation," *Internet Pats.*, 790 F.3d at 1348. *Second*, the individual and ordered combination of elements here is conventional, for reasons explained above. No element individually nor in combination overrides convention to show how the asserted advance is accomplished. *See DDR*, 773 F.3d at 1258. "[A]n improved structure or function [is still] missing here." *See Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1368 (Fed. Cir. 2024) (rejecting claim to "user interface"). *Finally*, whatever if anything iCharts invented, what iCharts put into the claim language is not "significantly more" than a claim to the idea itself. *See id.* at 1371.

iCharts barely mounts a response.

United States District Court
Northern District of California

1    *First*, iCharts asserts that the complaint alleges iCharts achieved *something*

2    unconventional:  creating a self-contained, interactive chart that could be embedded onto

3    websites with little or no coding (Opp. 22 (citing Compl. ¶¶ 46–49); *see also* Compl. ¶ 42

4    (citing analogous passage in '892 patent)).  But the specification describes that "[a] lot of web-

5    sites today offer widgets where the embed code can be pasted into the [website] code, avoiding

6    any particular knowledge of coding or HTML" ('000 patent, col. 8 ll. 36–38).  Moreover, the

7    specification describes conventional tools for updating the embedded objects automatically,

8    discussed below.  It is not plausible to read such passages in the specification as touting what

9    was invented, instead of as explaining what was conventional and applied to this use case.  *See*

10   *Beteiro*, 104 F.4th at 1357–58.  Moreover, these statements in the specification cannot make up

11   for intrinsic claim deficiencies, *Symantec Corp.*, 838 F.3d at 1322, addressed next.  Were it

12   otherwise, the complaint's draftsman could always pick up where the claim's draftsman left

13   off, and "the determination of patent eligibility [would] 'depend simply on the draftsman's

14   art.'"  *Cf. Alice*, 573 U.S. at 224 (citations omitted) (quoting *Flook*, 437 U.S. at 593); *see also*

15   *Mayo*, 566 U.S. at 72.

16   *Second*, iCharts argues that the claim limitations respecting a "chart box folder" on one

17   webpage and a "chart box" on another webpage suffice to confer eligibility (Opp. 20).  These

18   limitations do not address the asserted advance but are appended to it.  And, in any case, these

19   appended limitations are anything but inventive:  The claim recites that a "chart box folder [is]

20   connected to the chart box such that" once selected charts are dragged into the folder they

21   appear in the box ('000 patent, col. 18 ll. 42–43).  Start with the connector:  What "connect[s]"

22   the two?  A "data feed."  The specification discusses data feeds in parenthetical references like

23   "(e.g., RSS feed, Atom Feed, etc.)" (*id.* at col. 15 l. 37).  Read in context, such data feeds can

24   only plausibly be conventional.  *See Beteiro*, 104 F.4th at 1358.  What about the "chart box"?

25   The "chart box is a web widget" ('000 patent, col. 18 ll. 30 (claim 1)).  The specification

26   discusses how "[a] lot of web-sites" already embedded "widgets" (*id.* at col. 8 ll. 36–37).

27   Indeed, Google's interactive charts used "widget[s]" (*see id.* at col. 1 ll. 32–38).  Thus, despite

28   the complaint's post hoc protestations (*e.g.*, Compl. ¶ 48), it is implausible to read either

22

1  limitation as anything but recited conventions applied to achieve the abstract idea of sharing

2  and displaying charts.  *See Beteiro*, 104 F.4th at 1357–58.

3      This order finds claim 1 of the '000 patent directed to an abstract idea and without

4  inventive concept.  And, because iCharts does not cite other claims in this patent and none

5  offer distinguishing features, this order finds that the entire '000 patent is ineligible.

6  *Berkheimer*, 881 F.3d at 1365.

7                          *        *        *

8      Many of the points made in this order about the patents' eligibility would also undermine

9  the patents' validity by reason of anticipation or obviousness.  (Such grounds for invalidity are,

10  of course, asserted in the co-pending but not yet instituted *inter partes* reviews.)  That some

11  points would do double duty (or not), is no reason to withhold the decision they already require

12  today.  *Flook*, 437 U.S. at 593; *Diehr*, 450 U.S. at 188–89; *Symantec Corp.*, 838 F.3d at 1315.

13  Given the preexisting mechanisms disclosed in the specifications, the claimed advance was a

14  mere application of convention to an abstract idea.  And, even more fundamental to *Alice*

15  concerns, except for two dependent claims across all patents, the claims are not limited in their

16  language even to that or to any means for *how* to accomplish the claimed advance.  *Morse*, 56

17  U.S. at 113; *Trading Techs.*, 921 F.3d at 1093; *Internet Pats.*, 790 F.3d at 1348; *Symantec

18  Corp.*, 838 F.3d at 1315–16.  The exceptions that impose a limitation are the '892 patent's

19  dependent claim 4, and the '000 patent's dependent claim 2, which each impose that "flash" be

20  used.  But, in iCharts's words, "Flash [wa]s not the invention" (Tr. 24), and no specific

21  improvement to that tool or mechanism is stated in the claims (nor in the specifications).  *See

22  Cap. One Fin. Corp.*, 850 F.3d at 1340, 1342 (re XML files); *ChargePoint*, 920 F.3d at 769

23  (claim language conclusive).

24      **3.    JUDICIAL NOTICE.**

25      Tableau also requests judicial notice of various facts (Dkt. No. 75).  iCharts opposes the

26  request (Dkt. No. 88), even while appending its own expert declaration (Dkt. No. 87-1).  Our

27  regional court of appeals disfavors a frolic to take notice, *see Khoja*, 899 F.3d at 998–99, and

28  not even a detour is needed to reach the result here, where our *Alice* inquiry must remain

United States District Court
Northern District of California

tethered to the claim language, *see Enfish*, 822 F.3d at 1337; *ChargePoint*, 920 F.3d at 769. The request for judicial notice (Dkt. No. 75) is **DENIED AS MOOT,** and the unsolicited expert declaration (Dkt. No. 87-1) **STRICKEN.**  Other pending motions (Dkt. Nos. 95, 108) are likewise **MOOT.**

## CONCLUSION

Tableau's motion for judgment on the pleadings that iCharts's asserted patents are invalid (Dkt. No. 74) is **GRANTED.**  The '892 patent, the '595 patent, and the '000 patent are directed to abstract ideas and lack inventive concept, and are therefore ineligible for patenting under Section 101.  Because the patents' claim language suffers fundamental infirmities that assertions elsewhere cannot repair, amending the pleadings is futile:  "No amendment to a complaint can alter what a patent itself states." *Sanderling Mgmt. Ltd. v. Snap Inc.*, 65 F.4th 698, 706 (Fed. Cir. 2023).  The counterclaims seeking declaratory relief that the patents are invalid or uninfringed (Dkt. No. 18) are **MOOT.**  The clerk shall **CLOSE THE FILE.**

IT IS SO ORDERED.

Dated:  December 12, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

United States District Court
Northern District of California