Fabio E. Marino (SBN 183825)
Fabio.Marino@wbd-us.com
**WOMBLE BOND DICKINSON (US) LLP**
1279 Oakmead Parkway
Sunnyvale, CA 94085
Tel:  408-720-3436

Steven M. Levitan (SBN 148716)
Steve.Levitan@wbd-us.com
Christian E. Mammen (SBN 188454)
Chris.Mammen@wbd-us.com
Carrie J. Richey (SBN 270825)
Carrie.Richey@wbd-us.com
Daniel M. Grigore (SBN 347602)
Daniel.Grigore@wbd-us.com
**WOMBLE BOND DICKINSON (US) LLP**
50 California Street, Ste. 2750
San Francisco, CA 94111
Tel:  415-765-6240

Attorneys for Plaintiff
iCHARTS LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| iCHARTS LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>TABLEAU SOFTWARE, LLC,<br><br>                    Defendant. | Case No.: 3:24-cv-03157-WHA<br><br>**iCHARTS LLC'S OPPOSITION TO TABLEAU SOFTWARE, LLC'S MOTION FOR ATTORNEYS' FEES**<br><br>Hearing Date: February 13, 2025<br>Time: 8:00 a.m.<br>Courtroom: 12 – 19th Floor<br>Judge: Honorable William Alsup<br><br>Complaint Filed:  October 10, 2023 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT .................................................................................................. 2

    A.    Legal Standards ................................................................................... 2

    B.    None of Tableau's Stated Grounds Warrants An Exceptional Case Finding ........ 2

        1.    Judicial Estoppel Cannot Be a Basis for An Exceptional Case Finding Because There Has Been No Adjudication of Tableau's Flawed Judicial Estoppel Theory ........................................................................ 2

        2.    Opposing Discretionary Transfer Under 28 USC § 1404 Cannot Be a Basis for An Exceptional Case Finding .............................. 8

        3.    iCharts' Position on the Section 101 Issue is Not a Basis for an Exceptional Case Ruling ................................................. 11

    C.    Tyz Law's Fee Request is Unreasonable ........................................... 13

        1.    Tableau's Claimed Fees are Excessive ................................... 13

        2.    Seymour Duncker Should Not Be Made Personally Liable .................. 16

III.  CONCLUSION ............................................................................................. 17

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*Ah Quin v. Cnty. of Kauai Dep't of Transp.*,
5     733 F.3d 267 (9th Cir. 2013) .................................................................. 6

6

*Bilski v. Kappos*,
    561 U.S. 593 (2010)........................................................................... 12

7

*CertusView Technologies, LLC v. S & N Locating Services, LLC*,
8     287 F. Supp. 3d 580 (E.D. Va. 2018) ........................................ 11, 12, 13

9

*Gust, Inc. v. Alphacap Ventures, LLC*,
10     905 F.3d 1321 (Fed. Cir. 2018)......................................................... 8, 12

11

*Hamilton v. State Farm Fire & Cas. Co.*,
     270 F.3d 778 (9th Cir. 2001) ............................................................ 6, 8
12

13

*Hazelquist v. Guchi Moochie Tackle Co., Inc.*,
     437 F.3d 1178 (Fed. Cir. 2006)............................................................ 7
14

15

*Hensley v. Eckerhart*,
     461 U.S. 424 (1983)............................................................................ 2

16

*Homeland Housewares LLC v. Sorensen Research & Dev. Trust*,
17     581 F.App'x 877 (Fed. Cir. 2014) ................................................... 11, 12

18

*In re Coastal Plains, Inc.*,
     179 F.3d 197 (5th Cir. 1999) ............................................................... 7
19

20

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
     876 F.3d 1372 (Fed. Cir. 2017)............................................................ 12

21

*Iris Connex, LLC v. Dell, Inc.*,
     235 F.Supp.3d 826 (E.D. Tex. 2017)................................................. 2, 16
22

23

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
     566 U.S. 66 (2012)............................................................................ 12

24

*Miller Mendel, Inc. v. City of Anna, Texas*,
25     107 F.4th 1345 (Fed. Cir. 2024) .......................................................... 12

26

*Mortgage Application Technologies, LLC v. MeridianLink, Inc.*,
     839 F.App'x 520 (Fed. Cir. 2021) ........................................................ 12

27

28

1

*TABLE OF AUTHORITIES con't*

**Page(s)**

2

**Cases**

3

*Nelson v. Adams USA, Inc.*,
 529 U.S. 460 (2000) ........................................................................................................ 16

4

*Newton v. Thomason*,
 22 F.3d 1455 (9th Cir. 1994) ........................................................................................ 8

5

6

*Octane Fitness v. ICON Health & Fitness, Inc.*,
 572 U.S. 545 (2014) ........................................................................................................ 2

7

*Ohio Cellular Products Corp. v. Adams USA, Inc.*,
 175 F.3d 1343 (Fed. Cir. 1999) .................................................................................. 16

8

9

*People.ai, Inc. v. SetSail Technologies, Inc.*,
 No. 20-09148-WHA, 2022 WL 1556416 (N.D. Cal., May 17, 2022) .......................... 2, 3, 12

10

*Prism Technologies LLC v. T-Mobile USA, Inc.*,
 696 F.App'x 1014 (Fed. Cir. 2017) ............................................................................ 13

11

12

*Realtime Adaptive Streaming L.L.C. v. Sling TV, L.L.C.*,
 113 F.4th 1348 (Fed. Cir. 2024) ................................................................................ 13

13

14

*Std. Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
 754 F.2d 345 (Fed. Cir. 1985) .................................................................................... 7

15

16

*Sussman v. Bank of Israel*,
 56 F.3d 450 (2d Cir. 1995) .......................................................................................... 8

17

18

*Zeta Global Corp. v. Maropost Marketing Cloud, Inc.*,
 No. 20 Civ. 3951 (LGS), 2023 WL 355655 (S.D.N.Y., Jan 23, 2023) ...................... 13

19

**Statutes**

20

28 U.S.C. § 1404(a) ......................................................................................................... 4

21

28 USC § 1404 ............................................................................................................ 2, 1, 8

22

35 U.S.C. § 282(a) ...................................................................................................... 11, 12

23

24

35 U.S.C. § 285 ............................................................................................................ 2, 3

25

35 U.S.C. § 286 ............................................................................................................ 4, 7

26

**Rules**

27

F.R.C.P. 12(b)(3) ............................................................................................................ 8

28

## I.    INTRODUCTION

After iCharts filed its Notice of Appeal (D.N. 119) of this Court's order granting judgment on the pleadings concerning patent eligibility under Section 101, Tableau has moved to have this case declared exceptional and seeks an award of over $1.8 million in attorneys' fees. In every respect, Tableau's Motion for Attorneys' Fees (D.N. 121) is an overreach.

None of Tableau's three articulated rationales for its requested exceptional case finding withstands scrutiny; moreover, its claim for $1.8 million is excessive, and its request to pierce the corporate veil of iCharts LLC is improper and unsupported.

Tableau's lead-off argument is based on a newly presented issue—judicial estoppel—that has never been briefed or adjudicated in this action. Tableau has identified no support for the proposition that a non-litigated issue can form the basis for an exceptional case finding – and such a position raises serious Due Process concerns.

Tableau's second argument fares no better. Even though Tableau *conceded* that venue was proper in the Western District of Texas, where the case was initially filed, Tableau would have this Court declare that opposing a 28 U.S.C. § 1404 motion to transfer the case to a putatively more *convenient* forum somehow rises to the level of exceptional case. Again, this position is without support.

Third, Tableau argues that this case should be declared exceptional based on this Court's grant of judgment on the pleadings—without waiting for the Federal Circuit to weigh in. The single case Tableau cites is inapposite.

Finally, Tableau's claim for fees is excessive and, in seeking to impose joint and several liability on non-party Seymour Duncker, improperly seeks to pierce iCharts' corporate veil in contravention of Mr. Duncker's Due Process rights.

The Court should not consider Tableau's fee motion until after the Federal Circuit has resolved iCharts' pending appeal. *See also* iCharts' Administrative Motion to Stay Fee Motion, filed contemporaneously herewith. But if the Court does take up the motion, it should be denied.

## II.    ARGUMENT

### A.    Legal Standards

An award of attorneys' fees is governed by 35 U.S.C. § 285. The Supreme Court, in *Octane Fitness v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), rejected the Federal Circuit's prior "objectively baseless" and "subjective bad faith" formulation as "overly rigid" and laid out a more flexible framework. *See id.* at 554-558. The Supreme Court thus imbued the word "exceptional" with its ordinary meaning: "uncommon," "rare," "not ordinary," "unusual," or "special." *Id.* at 553-554. The Supreme Court defined an "exceptional" case as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *People.ai, Inc. v. SetSail Technologies, Inc.*, No. 20-09148-WHA, 2022 WL 1556416, *1 (N.D. Cal., May 17, 2022) (Alsup, J.) (quoting *Octane Fitness*). "The Court may, in its discretion, exclude any hours that are excessive, redundant, or otherwise unnecessary and may reduce the hourly rate if it deems it excessive." *Iris Connex, LLC v. Dell, Inc.*, 235 F.Supp.3d 826, 854 (E.D. Tex. 2017) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

### B.    None of Tableau's Stated Grounds Warrants An Exceptional Case Finding

#### 1.    Judicial Estoppel Cannot Be a Basis for An Exceptional Case Finding Because There Has Been No Adjudication of Tableau's Flawed Judicial Estoppel Theory

Remarkably, Tableau's first putative rationale for having this case declared exceptional is an affirmative defense that has not actually been adjudicated – or even litigated – and as to which Tableau has failed to even provide disclosures in response to discovery requests.

In its Answer, Tableau asserted estoppel as its fourth affirmative defense as a short two-sentence defense. D.N. 18 p.15. In the parties' Joint Case Management Statement, Tableau included two paragraphs about the bankruptcy of iCharts, Inc. in its description of the facts ("ICI") (D.N. 100 p. 5) and listed estoppel as one of the disputed issues "that this action will likely require

the Court to resolve." *Id.* But Tableau has never sought any relief or adjudication of its estoppel defense.

iCharts propounded discovery to Tableau, including Interrogatory No. 4, which states, "Describe the complete factual and legal basis for each affirmative defense, counterclaim, and assertion that iCharts allegedly is not entitled to the relief it requested in the Complaint that is included in Tableau's Answer and Counterclaims, (D.N. 18), or in Tableau's Answer or Counterclaims to any later amended complaint." Declaration of Fabio Marino in Response to Tableau's Motion for Attorneys' Fees ("Marino Decl.") Ex. A (Tableau's Responses to iCharts' First Set of Interrogatories) p.9. Tableau provided no substantive response. *Id.* pp. 9-10. Despite repeated efforts to meet and confer (Marino Decl. Exs. B (p. 11), C (p.2) (discovery meet and confer letters covering Interrogatory No. 4)), Tableau did not supplement its response to Interrogatory No. 4 in two subsequent rounds of supplementation. Marino Decl. Exs. D, E (Tableau's supplemental Interrogatory responses). Additionally, although one of Tableau's stated rationales in its motion to transfer the case from the Western District of Texas to this District was that the ICI bankruptcy occurred here and sources of third-party discovery related thereto are local (D.N. 29 at, e.g., pp. 5, 10, 13, 19), Tableau never sought any such third-party discovery.

At a minimum, before the Court can even reach the question whether Tableau's putative judicial estoppel defense is a basis for an exceptional case finding, there must be a full and fair opportunity to develop the record and adjudicate the merits of the defense. This includes full discovery as well as full briefing on a merits motion, including the opportunity to submit evidence.

On the present record, because the issue of judicial estoppel has not been decided, or litigated, or subject to discovery, it should not form the basis of an exceptional case finding. In *People.ai*, following a finding of patent ineligibility under Section 101, this Court declined to award fees under Section 285. Importantly, this Court specifically "decline[d] to consider material not yet ripe for review that had yet to have any role in this action in an evaluation of exceptionality." 2022 WL 1556416, *3. The same is true here with respect to Tableau's putative judicial estoppel defense.

Moreover, a closer look at Tableau's theory of judicial estoppel, as articulated in its fee motion, exposes its many factual and legal gaps. Tableau blithely seeks to paper over those defects with innuendo and gloss.

*First*, Tableau mischaracterizes the 2013 and 2017 communications between ICI and Tableau. Tyz Decl. Ex. 7 includes copies of the email threads, and Tyz Decl. Ex 11 includes a narrative interrogatory response summarizing the communications. Nowhere in either exhibit is a reference by ICI to any assertion that Tableau infringes any claim of the Asserted Patents; to the contrary, the main focus of the communications was ICI's pursuit of some kind of a business or "partnering" arrangement. *Id.* In that context, being aware that iCharts had products that were covered by iCharts' patents is germane to potential business discussions, not a threat to bring suit for infringement. *See* Motion at 3 (citing Tyz Decl. Ex. 11 at 5). The same explanation applies to Tableau's awareness of iCharts' patents in 2017. Contrary to Tableau's assertion that this asserted awareness "eliminate[s] any doubt that Seymour Duncker and [ICI] recognized their claims in 2017," (Motion at 3) the contrary explanation is stated in the next sentence of iCharts' discovery response: "Tableau has been on notice of the Patents-in-Suit since at least as early as 2017. In 2017, iCharts, Inc. (prior assignee of the Patents-in-Suit) and Tableau discussed *Tableau's potential acquisition of iCharts, Inc.,* during which discussions iCharts, Inc. made Tableau aware of iCharts, Inc.'s patent portfolio including the Patents-in-Suit." Tyz Decl. Ex. 11 at p.4 (emphasis added). Similarly, Tableau attempts to make hay out of the fact that the six-year damages period for this case covers the six-year period preceding the filing of the Complaint in October 2023— therefore dating back to October 2017. *See* 35 U.S.C. § 286. Tableau's suggestion that ICI was therefore aware of Tableau's infringement in October 2017 is simply fallacious.

*Second*, Tableau selectively excerpts and mischaracterizes portions of the bankruptcy record. For example, as explained in the Declaration of Lisa Bittle Tancredi in Support of Plaintiff iCharts' Opposition to Defendant Tableau's Motion to Transfer to the Northern District of California Under 28 U.S.C. § 1404(a) (D.N. 45-22; "Tancredi Decl."), there are important distinctions between the face value of assets and the valuation in the bankruptcy estate, which is sometimes determined in terms of an asset's "liquidation value" (aka "the price of the property

when it is not allowed sufficient time to sell in the open market"). Tancredi Decl. ¶¶ 6-7. Thus, even if one assumes that the sparse communications from 2013 and 2017—which never discuss patent infringement (*see* Declaration of Ryan Tyz in Support of Tableau's Motion for Attorneys' Fees (D.N. 121-1; "Tyz Decl.") Exs. 7, 11)—could constitute a "claim" for patent infringement requiring disclosure, there is nothing in the record to support an assumption that the bankruptcy liquidation value of such an undeveloped, unarticulated "claim" would be anything other than $0. Tableau certainly had reason to know better than to persist in the mischaracterizations in its Fee Motion; many of them were addressed and dispelled in the Tancredi Declaration.

As the Tancredi Declaration explains, Tableau misapplies the bankruptcy term of art, "abandonment," which is a term of art in bankruptcy meaning not that the property has no value, but that the property has no value *to the estate*, for example because the logistics, timing and burden of selling it on a compressed timeframe in the bankruptcy proceeding make it not worth pursuing. Tancredi Decl. ¶ 8. Tableau further misunderstands that the patents and source code were given "liquidation" value, not a market value. Liquidation value "is not the value that a sale of property might yield in the open market" but rather its value when the estate is not allowed sufficient time to sell the asset in the open market. Tancredi Decl. ¶¶7, 8. Because the trustee was unable to liquidate the patents, they were to be abandoned, which does *not* mean that the patents were worthless, but rather that, given time and cost to market and sell them, the assets had no value to the estate. *Id*. ¶¶8, 11. Mr. Duncker then attempted to purchase the patents based on their estimated liquidation, not market, value, as there is no indication in the bankruptcy documents that a fair market value was ever placed on them. *Id*. ¶¶13, 14. The logic of Tableau's own arguments is internally inconsistent. On the one hand, Tableau argues that Seymour Duncker offered to purchase the Asserted Patents, but was rebuffed by the Trustee (Motion at 4), but that this was somehow part of Mr. Duncker's purported scheme to get the patents for free (Motion at 5).

*Third,* even assuming that Tableau has correctly characterized ICI's bankruptcy disclosures (which iCharts disputes, *see* Tancredi Decl. ¶¶5, 7–14), Tableau has identified no cases where awareness of patents and possible overlap of the general subject matter of the patents with another party's products constitutes an extant "claim" for patent infringement within the meaning of the

1    bankruptcy rules. Tableau has not identified any evidence suggesting that ICI actually did know

2    there was a "claim" for patent infringement; nothing Tableau cites suggests that ICI conducted any

3    kind of infringement analysis of any patent claim or that ICI asserted that a patent claim was

4    infringed. Even to the extent, hypothetically, it could be posited that ICI knew of a "claim" for

5    infringement at the time of the bankruptcy that was not properly scheduled, it may be curable if

6    the failure was due to "mistake" or "inadvertence." *Ah Quin v. Cnty. of Kauai Dep't of Transp.*,

7    733 F.3d 267, 277 (9th Cir. 2013). Indeed, it is not hard to foresee that the position Tableau

8    advocates could lead to a slippery slope and absurd results, where any awareness by a bankrupt

9    patentee of a competitor's products would give rise to judicial estoppel from those patents being

10   asserted against the competitor. The few cases Tableau cites in this portion of its motion are all

11   distinguishable.

12        In *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001), Lawrence

13   Hamilton owned a house and was insured by State Farm. On May 30, 1997, the house was damaged

14   by some disconnected water supply lines, and some items were allegedly stolen. Hamilton filed an

15   insurance claim and toured the house with the insurance adjuster on June 18, 1997 and July 1,

16   1997, and State Farm continued to investigate through September 1997. In August and October

17   1997, Hamilton's lawyers wrote to State Farm, threatening litigation if the claim was not quickly

18   paid. State Farm did not pay the claim, and indeed suspected that Hamilton himself was responsible

19   for the losses. *Id.* at 780-781. Hamilton filed bankruptcy on October 31, 1997 and in his subsequent

20   schedules listed a $160,000 loss due to the alleged residential vandalism, but did not list the

21   insurance claim as an asset. The bankruptcy trustee asked if Hamilton was pursuing an insurance

22   claim to recover for the loss, and Hamilton never responded. Ultimately, the bankruptcy was

23   dismissed and the bankruptcy court vacated the discharge of his debts. *Id.* Thereafter, Hamilton

24   sued State Farm for bad faith denial of coverage. *Id.* State Farm moved for summary judgment and

25   for a determination of judicial estoppel. The district court dismissed Hamilton's claim and the

26   Ninth Circuit affirmed. *Id.* at 782, 786. *Hamilton* is distinguishable from the present case in at least

27   several respects: (1) the debtor was clearly aware of the existence of a "claim"; (2) before

28   bankruptcy, the debtor had threatened litigation to enforce the "claim"; and (3) the underlying

claim was based on a discrete event that occurred on a pre-bankruptcy fixed date, not a series of ongoing infringements.

In *In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999), involved a complex commercial transaction concerning the purchase of a company, negotiations for the return of inventory sold to the company on credit, and an intervening bankruptcy filing. *Id.* at 202. While the Fifth Circuit's decision does include the language Tableau quotes ("The debtor need not know all the facts or even the legal basis for the cause of action.")—itself a quotation of an Eastern District of Texas ruling—the general statement in that quotation begs the key question here, concerning the level of knowledge of a claim for *patent infringement* necessary to trigger the bankruptcy disclosure obligation. Nothing in *Coastal Plains* sheds light on that question.

*Fourth*, again even assuming that judicial estoppel might apply in some fashion, Tableau offers no theory as to how such an estoppel would apply to *new acts of infringement* occurring after the bankruptcy filing. Under 35 U.S.C. § 286, damages for patent infringement are recoverable for a period starting up to six years before the commencement of suit, regardless of whether the accused infringer actually started infringement many years before that. *Std. Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348, 349 (Fed. Cir. 1985). This is because "each act of patent infringement gives rise to a separate cause of action." *Hazelquist v. Guchi Moochie Tackle Co., Inc.*, 437 F.3d 1178, 1180 (Fed. Cir. 2006) (citations omitted.). In *Hazelquist*, the Federal Circuit relied on this core principle of patent law to conclude that an infringing debtor who continued to infringe the plaintiff's patents following discharge in bankruptcy could be liable for the post-bankruptcy infringement. In other words, defendant's "bankruptcy discharge did not immunize him from suit for those causes of action that arose after the discharge." *Id.* at 1181. The same principle applies here: to the extent (if at all) judicial estoppel could preclude claims for infringement that should have been listed on the patentee's bankruptcy schedules, it does not "immunize" the infringer for post-bankruptcy acts of infringement. The bankruptcy case closed on December 28, 2020. *See* docket for N.D. Cal. Bkrcy Case No. 18-50958. So even if judicial estoppel might apply, it would—at most—truncate the damages period to post-December 28, 2020 damages, rather than post-October 10, 2017 damages. iCharts cannot be estopped from asserting

a patent infringement claim where the infringing conduct did not occur until *after* the bankruptcy. The ongoing nature of patent infringement claims with a six-year rolling limitations period is simply very different from the kinds of time-delimited claims like the ones at issue in *Hamilton* and *Coastal Plains*.

Tableau has identified *no cases* where an affirmative defense that has not been litigated and decided can form the basis of an exceptional case finding. iCharts' own research has found no such cases. Tableau chose not to pursue its theory of judicial estoppel through discovery and motion practice. It cannot now use the mechanism of a Section 285 motion to sneak this theory in the back door without giving iCharts a full and fair opportunity to litigate the merits of the issue and its many nuances. This issue is simply not ripe as a basis for Tableau's Section 285 motion, and even if it could be considered in the exceptional case context, and even if Tableau's defense is ultimately adjudicated to be meritorious, its only impact would be to alter the damages period. This is, manifestly, not a basis for an exceptional case finding.

### 2. Opposing Discretionary Transfer Under 28 USC § 1404 Cannot Be a Basis for An Exceptional Case Finding

Tableau's second argument fares even worse. Tableau *conceded* that venue in the Western District of Texas was "technically [] proper," that it has conducted business in Texas and the Western District of Texas, and that it has employees who work in Austin, Texas. D.N. 18 pp. 2-3, ¶¶ 6-8. Accordingly, Tableau did not move to dismiss the action for improper venue under Federal Rule of Civil Procedure 12(b)(3), but rather, moved to transfer venue for convenience under 28 U.S.C. § 1404. D.N. 29 pp. 7–8. Again, Tableau cites no case law finding an exceptional case for opposing a Section 1404 transfer. And iCharts' research has identified no such cases. To the contrary, the Federal Circuit and the Ninth Circuit have both held that "an attorney need not bring a case in the most convenient forum, but only a proper forum." *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1333 (Fed. Cir. 2018) (citing *Sussman v. Bank of Israel*, 56 F.3d 450, 457 (2d Cir. 1995)); *Newton v. Thomason*, 22 F.3d 1455, 1463-1464 (9th Cir. 1994) (cited in *Sussman*) ("Attorneys are not under an affirmative obligation to file an action in the most convenient forum; their only obligation is to file in a proper forum."). Since venue in the Western District of Texas

was indisputably proper, opposing discretionary transfer cannot be the basis for an exceptional case finding.

In its Motion, Tableau argues that in the context of opposing the Motion to Transfer, it was somehow improper for iCharts to file an *unopposed* motion for extension of time (D.N. 30), to seek expedited venue-related discovery to address disputed issues about the locations of Tableau's offices and workforce (D.N. 31), to file an *unopposed* request for extra pages for its opposition brief (D.N. 35), and to strike new arguments and evidence that were introduced for the first time in Tableau's reply (D.N. 56). *See* Motion at 5. But none of these filings is remotely unusual or problematic, and it is preposterous for Tableau to suggest that two routine motions *it did not oppose* could be the basis for an exceptional case finding. Furthermore, expedited venue discovery is a common enough request in the Western District of Texas that some judges in that district have standing orders dedicated solely to allowing venue discovery for transfer motions (*see* Amended Standing Order Regarding Venue and Jurisdictional Discovery Limits for Patent Cases, https://www.txwd.uscourts.gov/court-staff/u-s-district-judge-alan-albright/). It follows that iCharts' request for venue discovery was anything but exceptional.

In its opposition to Tableau's transfer motion, as well as the related motions for expedited discovery and to strike, the central dispute concerned the location and magnitude of Tableau's contacts, and whether venue was even proper in this District. D.N. 31 pp.5–7; 45 pp.3–14; *see, generally*, 56. As noted, venue was proper in the Western District of Texas because Tableau has employees there, and Tableau conceded venue there and waived any challenge to it. iCharts maintained that Tableau's Austin office was in fact its second-largest office after its Seattle headquarters (D.N. 45 p.2; D.N. 31 pp.1-2). Additionally, iChart's predecessor, ICI, had relevant contacts in the Western District of Texas. Before its bankruptcy, ICI had a major established business relationship with Austin-based NetSuite and also engaged with important customers in Texas. D.N. 45 pp. 8, 11. *Both* parties had ties to the Western District of Texas, and potential witnesses and evidence would also be located there for litigation purposes. *Id*. pp.8–14.

In its fee Motion, Tableau argues that this District was a preferable venue, focusing almost entirely on the location of *iCharts*-related witnesses and documents, and *third-party* sources of

prior art. *See, e.g.,* D.N. 29 pp.10–14. *None* of the sources of proof Tableau now relies on to argue exceptionality were Tableau-related. Motion at 5-6. In fact, Tableau's Motion points to no *Tableau*-related sources of proof as justification for transferring to this District. *Id.*

There were serious and significant factual disputes over whether Tableau had *any* offices in the Northern District of California (D.N. 45 p.1). In its fee Motion, Tableau alludes to Tableau employees who "work at two physical offices in NDCA," evidently referencing the offices of its corporate parent, Salesforce (D.N. 45 p.2; *see also* D.N. 39-2 ¶¶6, 7, 9). When iCharts dug into Tableau's presence in the NDCA, it discovered that Tableau—headquartered in Seattle, Washington since 2004—only had an abandoned shell office in the Bay Area: a Palo Alto location at 260 California Ave. D.N. 31-2 p.1. No Salesforce offices (Tableau's separate and independent parent company) were listed on Tableau's website as locations of business. *Id.* In the absence of court-authorized venue discovery, iCharts was forced to investigate further and discovered that the Palo Alto office listed on Tableau's website and characterized by its declarant as still one of its "main engineering locations," was listed for lease. D.N. 45-1 ¶¶7, 8. iCharts' investigator discovered that not only had the office been listed since 2023, but it had been vacated in 2020 and not occupied since. *Id.* ¶¶2-9. The transferring Court *agreed* with iCharts on this point: Tableau could not rely on the Palo Alto office to prove a regular place of business that satisfied venue requirements. D.N. 61 pp.10–11. In this way, not only did iCharts correctly identify a serious venue issue, but the transferring court *agreed* with iCharts and stated that Tableau's ghost office did not meet venue standards.

Tableau belatedly offered a new declaration by third-party Salesforce's in-house counsel in connection with Tableau's sur-reply to iCharts' separate motion for venue discovery. D.N. 39-2. The new declaration implied that the original declaration in support of transfer, by a Tableau engineer, had not referred to the (vacated) Palo Alto office at 260 California Ave. as Tableau's place of business, but rather to Salesforce offices in Palo Alto and San Francisco. *Id.* at ¶¶6, 7, 9. This was misleading: statements in the Tableau engineer's declaration were accurate with respect to the 260 California Ave. location, but not with respect to any of the Salesforce offices. D.N. 45 p.2. The original declaration, purporting to establish Tableau's NDCA place of business,

unmistakably referenced the 260 California Ave. office that Tableau closed in 2020, and *not* any Salesforce office. *Id*. The transferring court ultimately deemed the belatedly disclosed Salesforce offices sufficient for venue to lie in NDCA, although iCharts was not allowed any venue discovery before the case moved to California. D.N. 61 pp.7–8, 11–13.  The transferring court looked to *Salesforce* office space in which *Tableau* employees purportedly work to satisfy venue requirements, a debatable proposition involving whether such space represents *Tableau's* place of business, particularly when iCharts was denied the ability to adduce and test the facts and circumstances of Tableau's possession or control of such space through discovery. *Id*. pp.11–13.

When Tableau argued that the Northern District of California should be the location of litigation, iCharts' decision to oppose was not exceptional; iCharts had good cause to oppose Tableau's motion to transfer, not only because the Western District of Texas was indisputably a *proper* venue, and not only because venue in the Northern District of California was questionable due to Tableau's shifting stories as to its place of business there, but also because, on balance, the applicable transfer factors—based on where the case could have been brought, and the location of witnesses, evidence, and convenience—were, at a minimum, a much closer call than Tableau makes them out to be. D.N. 45 pp.3–7, 8–20; 31 pp.5–7; 56 pp.1–3, 6–7.

### 3.    iCharts' Position on the Section 101 Issue is Not a Basis for an Exceptional Case Ruling

Finally, Tableau relies on this Court's recent grant of judgment on the pleadings as its third argument to support its fee request. But not only is the request premature, having been filed while appellate review is pending, but it is wrong on the merits.

As a starting point, the patents-in-suit, like all patents, are entitled to a presumption of validity under 35 U.S.C. § 282(a), and "[a] patent holder has the right to vigorously enforce its presumptively valid patent." *CertusView Technologies, LLC v. S & N Locating Services, LLC*, 287 F. Supp. 3d 580, 586 (E.D. Va. 2018) (quoting *Homeland Housewares LLC v. Sorensen Research & Dev. Trust*, 581 F.App'x 877, 881 (Fed. Cir. 2014)) (denying exceptional case finding after invalidating patents under Section 101).

1    The sole authority Tableau cites in this section of its brief, *Inventor Holdings, LLC v. Bed*

2    *Bath & Beyond, Inc.*, 876 F.3d 1372 (Fed. Cir. 2017), involved a fee motion that was not decided

3    until *after* the Federal Circuit had ruled on an appeal of the 101 ruling. *Id.* at 1371. *See also* Marino

4    Decl. Ex. F (district court docket (D.Del. Case No. 14-448-GMS for *Inventor Holdings*, listing

5    D.N. 87 (9/3/2015 notice of appeal), 88 (9/4/2015 motion for fees), 100 (4/7/2016 notice of ruling

6    on appeal), 107-108, 113 (5/31/2016 and 7/14/2016 orders re fee motion)). The Court here should

7    likewise defer ruling on Tableau's fee motion until after the Federal Circuit resolves iCharts'

8    appeal of the Section 101 issue. *See* iCharts' Administrative Motion to Stay Motion for Attorneys'

9    Fees, filed contemporaneously herewith.

10    *Inventor Holdings* is distinguishable. The holding depends on the limited circumstance

11    concerning the change in law of *Alice* and whether plaintiffs' theory of patentability for a

12    computer-implemented business transaction remained viable after *Alice*. As the district court

13    explained in *CertusView*, *Inventor Holdings* is limited to the narrow circumstance where the patent

14    issued before *Bilski v. Kappos*, 561 U.S. 593 (2010) and *Mayo Collaborative Servs. v. Prometheus*

15    *Labs, Inc.*, 566 U.S. 66 (2012), and was therefore not entitled to the Section 282(a) presumption

16    of validity. *CertusView*, 287 F.Supp.3d at 594. By contrast, the Patents-in-Suit here, like the

17    patents in *CertusView*, issued after *Bilski* and *Mayo* and are entitled to the statutory presumption

18    of validity. *Id.* Moreover, as the Federal Circuit has observed, post-*Inventor Holdings*, "there is no

19    bright line exclusion of software patents or business method patents from patent eligibility." *Gust,*

20    *Inc. v. Alphacap Ventures LLC*, 905 F.3d 1321, 1329 (Fed. Cir. 2018). Indeed, in *People.ai*, this

21    Court specifically reached the same conclusion, distinguishing *Inventor Holdings* on its procedural

22    facts just after the *Alice* ruling, and declining to impose an exceptional case finding. *People.ai*,

23    2022 WL 1556416, *2.

24    In fact, numerous cases have rejected fees under Section 285 even while finding the patents

25    to be unpatentable under Section 101. *E.g., Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th

26    1345, 1356-1357 (Fed. Cir. 2024) (patent involving software system for managing pre-

27    employment background investigations); *Mortgage Application Technologies, LLC v.*

28    *MeridianLink, Inc.*, 839 F.App'x 520, 526-527 (Fed. Cir. 2021) (patent on online loan origination

service for creating and populating loan applications); *Prism Technologies LLC v. T-Mobile USA, Inc.*, 696 F.App'x 1014, 1018-1019 (Fed. Cir. 2017) (patents on security systems for use with computer networks that provide a secure transaction system for use with untrusted networks). *See also CertusView*, 287 F.Supp.3d at 600; *Zeta Global Corp. v. Maropost Marketing Cloud, Inc.*, No. 20 Civ. 3951 (LGS), 2023 WL 355655, *1, *4, *5 (S.D.N.Y., Jan 23, 2023) ("It was not unreasonable for Zeta to attempt to distinguish the contrary but constantly evolving case law" concerning software patents and Section 101) (distinguishing *Inventor Holdings*). In *Realtime Adaptive Streaming L.L.C. v. Sling TV, L.L.C.*, 113 F.4th 1348 (Fed. Cir. 2024), the Federal Circuit vacated an exceptional case finding by the district court despite having previously affirmed a Section 101 finding of unpatentability. The Federal Circuit rejected several of what the district court had called "red flags" concerning the merits of the case, and accordingly vacated and remanded the exceptional case ruling.

### C.    Tyz Law's Fee Request is Unreasonable

#### 1.    Tableau's Claimed Fees are Excessive

Even though the only substantive ruling in the case was a motion for judgment on the pleadings, and even though the case was pending for a little over a year, Tableau claims to have accumulated over $1.8 million in legal fees.

Over 40% of that total comes from the billings of just one lawyer, Erin Jones. Tyz Decl. ¶ 19. According to the Tyz Declaration, her "time spent working on this case involved assisting with strategy, overseeing and revising Defendant's motions, motion responses, and discovery, managing the day-to-day activities in this matter, leading technical aspects of the case, developing non-infringement and invalidity positions, researching prior art, leading disclosures and contentions, and working with a technical expert and overseeing the contract attorneys [listed] below in the charting prior art references for invalidity contentions." Tyz Decl. ¶ 22. Two other attorneys, Ciara McHale and Udit Sood, were responsible for "handling day-to-day activities." Tyz Decl. ¶¶ 23, 24. And another attorney, Xiaoyuan Zhang, spent over 110 hours on third-party prior art discovery, researching and analyzing system prior art, and supplementing invalidity contentions, while two contract attorneys, John Giust and Wendy Akbar, spent over 300 hours on

prior art analysis, drafting contentions, and technical analysis of the accused and practicing products. Tyz Decl. ¶¶ 27-28. The combined time spent by those five lawyers—on tasks that significantly overlap with Dr. Jones—totals just 80 hours more than Dr. Jones claims to have spent.

Tableau has allocated approximately $1.5 million of its fee calculations among three buckets, "Motion to Transfer," "Motion for Judgment on the Pleadings," and "Discovery / Invalidity Contentions." This leaves over $300,000 unallocated to any primary category of tasks. This $300,000 should be disallowed.

Tableau has also estimated that $232,091 should be allocated to the Section 1404 Motion to Transfer. But, as explained above, there is no authority to support an exceptional case finding for opposing transfer from one proper venue to another (arguably improper) venue. This amount should also be disallowed.

Most significantly, over $1 million has been allocated to "Discovery / Invalidity Contentions." None of Tableau's arguments for exceptional case relate in any way to discovery or invalidity contentions,[1] other than, arguably, that discovery commenced before Tableau filed its Rule 12(c) motion and the invalidity contention disclosure requirements found in the N.D. Cal. Patent Local Rules became applicable following the grant of Tableau's motion to transfer. Moreover, discovery was still in its early stages when the 101 motion was decided. No depositions had been taken, and few Tableau documents had been produced. *See generally* Marino Decl. Exs. B, C (discovery meet and confer correspondence). Thus, this over $1M figure for "Discovery / Invalidity Contentions" appears excessive.

Additionally, Tableau's own litigation choices played a significant role in protracting these proceedings. Tableau's Section 101 motion was styled as a Rule 12(c) motion for judgment on the pleadings. As such (and disregarding its reliance on factual assertions that were either absent from the pleadings or supported by extrinsic evidence), Tableau could have brought this motion instead

---

[1] Given that Tableau identifies a different category of claimed fees relating to its Rule 12(c) motion, iCharts understands this term not to refer to the development and disclosure of its Section 101 argument, as manifested in the Rule 12(c) motion.

of filing its Answer on December 22, 2023 (after seeking and obtaining two extensions of the Rule 12 deadline). D.N. 15, 17, 18.

If Tableau had filed its Section 101 motion as a Rule 12(b)(6) motion on December 22, 2023, it could have potentially avoided:

- All fees related to "Discovery / Invalidity Contentions"
- All fees related to "Motion to Transfer"

Based on the individual time entries in Tyz Declaration Exhibit 19, and excluding these two categories, the accrued fees between 11/7/2023 and 12/22/2023 would have been limited to the following amounts:

| Name | Hours | Rate | Fees |
|------|-------|------|------|
| Ryan Tyz | 12.3 | $925 | $11,377.50 |
| Erin Jones | 33.0 | $830 | $27,390 |
| Sean Apple | 9.6 | $685 | $ 6,576 |
| Ciara McHale | 0.3 | $830 | $   249 |
| Tiffany Weger | 3.1 | $320 | $   992 |
|  |  | **TOTAL** | **$46,584.50** |

Accepting for the sake of argument Mr. Tyz's assertion that his team accrued $235,157.50 in fees on the Section 101 motion, its total fees accrued would have been *less than $275,000* if Tableau had filed its Section 101 motion at the time its Answer was due.

But Tableau filed an Answer instead of a Rule 12(b)(6) motion, and then filed its motion to transfer a month later, on January 19, 2024. The simplest explanation is that Tableau wanted to forum-shop before filing its Section 101 motion. According to Lex Machina, Judge Pitman, the transferor judge in the Western District of Texas, had only ever entered four Section 101 invalidity rulings in 392 patent cases – and all of those were pre-2016. *See* Marino Decl. Exs. G, H (search

conducted 1/7/2025).[2] By contrast, this Court has entered ten Section 101 invalidity rulings in 221 patent cases—nine of them since 2018. *See* Marino Decl. Exs. I, J (search conducted 1/7/2025).  If Tableau had had confidence in the merits of its Section 101 argument before any Court, it would have brought a Rule 12(b) motion in the Western District of Texas, and virtually all of the categories of fees claimed by Tableau could have been avoided if Tableau had raised its Section 101 argument in a Rule 12(b) motion in December 2023. Even assuming the Court finds this case to be exceptional, iCharts should not be held responsible for the multiplication of Tableau's attorneys' fees due to Tableau's choice to delay the filing of its Section 101 motion.

### 2.    Seymour Duncker Should Not Be Made Personally Liable

Finally, Tableau argues that "[t]he Court should hold Plaintiff and Mr. Duncker jointly and severally liable for Tableau's fees."  Motion at 14. However, as Tableau reluctantly admits in a footnote at the end of its brief, piercing the corporate veil and summarily imposing liability on a non-party is not so simple. In *Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000), the Supreme Court held that Due Process requires observance of procedural formalities: a motion to amend the pleadings to add the non-party, service of process, an opportunity to respond to the pleading, and an opportunity to develop the record and to be heard on any issue putatively imposing liability on the non-party. *Id.* at 466-468.

Thus, rather than a one-paragraph afterthought at the end of its fee motion, an effort to bring Mr. Duncker personally into the litigation would require Tableau to file (and win) a motion to amend the pleadings, followed by the other procedural requisites to preserve his Due Process rights. Another of Tableau's cited cases, *Iris Connex, LLC v. Dell, Inc.*, 235 F.Supp.3d 826, 843-844 (E.D. Tex. 2017) relied on the Federal Circuit ruling in *Ohio Cellular Products Corp. v. Adams USA, Inc.*, 175 F.3d 1343, 1349 (Fed. Cir. 1999), which the Supreme Court reversed in *Nelson.*

Accordingly, this argument, too, is premature; Mr. Duncker is not a party before this Court.

---

[2] The case was initially assigned to W.D. Tex. Magistrate Judge Lane (who, according to LexMachina, has been assigned 33 patent cases and has never issued any patent invalidity rulings), but was subsequently reassigned to Judge Pitman.

## III.    CONCLUSION

For the foregoing reasons, Tableau's motion for attorneys' fees should be denied in its entirety. Alternatively, the Court should defer ruling on the motion until resolution of iCharts' pending appeal.

Dated: January 9, 2025                    Respectfully submitted,

                                          **WOMBLE BOND DICKINSON (US) LLP**


                                          */s/ Fabio E. Marino*
                                          Fabio E. Marino

                                          Counsel for Plaintiff
                                          *iCHARTS LLC*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................ 1

II.    ARGUMENT .................................................................................. 2

    A.    Legal Standards ................................................................. 2

    B.    None of Tableau's Stated Grounds Warrants An Exceptional Case Finding ........ 2

        1.    Judicial Estoppel Cannot Be a Basis for An Exceptional Case Finding Because There Has Been No Adjudication of Tableau's Flawed Judicial Estoppel Theory ................................................................. 2

        2.    Opposing Discretionary Transfer Under 28 USC § 1404 Cannot Be a Basis for An Exceptional Case Finding ..................................... 8

        3.    iCharts' Position on the Section 101 Issue is Not a Basis for an Exceptional Case Ruling ............................................... 11

    C.    Tyz Law's Fee Request is Unreasonable ........................................... 13

        1.    Tableau's Claimed Fees are Excessive ...................................... 13

        2.    Seymour Duncker Should Not Be Made Personally Liable .................... 16

III.    CONCLUSION .............................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ah Quin v. Cnty. of Kauai Dep't of Transp.*,
  733 F.3d 267 (9th Cir. 2013) .................................................................................. 6

*Bilski v. Kappos*,
  561 U.S. 593 (2010).............................................................................................. 12

*CertusView Technologies, LLC v. S & N Locating Services, LLC*,
  287 F. Supp. 3d 580 (E.D. Va. 2018) ...................................................... 11, 12, 13

*Gust, Inc. v. Alphacap Ventures, LLC*,
  905 F.3d 1321 (Fed. Cir. 2018)......................................................................... 8, 12

*Hamilton v. State Farm Fire & Cas. Co.*,
  270 F.3d 778 (9th Cir. 2001) .............................................................................. 6, 8

*Hazelquist v. Guchi Moochie Tackle Co., Inc.*,
  437 F.3d 1178 (Fed. Cir. 2006)............................................................................... 7

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)................................................................................................ 2

*Homeland Housewares LLC v. Sorensen Research & Dev. Trust*,
  581 F.App'x 877 (Fed. Cir. 2014) .................................................................... 11, 12

*In re Coastal Plains, Inc.*,
  179 F.3d 197 (5th Cir. 1999) .................................................................................. 7

*Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*,
  876 F.3d 1372 (Fed. Cir. 2017)............................................................................. 12

*Iris Connex, LLC v. Dell, Inc.*,
  235 F.Supp.3d 826 (E.D. Tex. 2017)................................................................. 2, 16

*Mayo Collaborative Servs. v. Prometheus Labs, Inc.*,
  566 U.S. 66 (2012)................................................................................................ 12

*Miller Mendel, Inc. v. City of Anna, Texas*,
  107 F.4th 1345 (Fed. Cir. 2024) ........................................................................... 12

*Mortgage Application Technologies, LLC v. MeridianLink, Inc.*,
  839 F.App'x 520 (Fed. Cir. 2021) ......................................................................... 12

1

2

### TABLE OF AUTHORITIES con't

**Page(s)**

**Cases**

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000) ........................................................................................ 16

*Newton v. Thomason*,
    22 F.3d 1455 (9th Cir. 1994) ............................................................................ 8

*Octane Fitness v. ICON Health & Fitness, Inc.*,
    572 U.S. 545 (2014) ......................................................................................... 2

*Ohio Cellular Products Corp. v. Adams USA, Inc.*,
    175 F.3d 1343 (Fed. Cir. 1999) ...................................................................... 16

*People.ai, Inc. v. SetSail Technologies, Inc.*,
    No. 20-09148-WHA, 2022 WL 1556416 (N.D. Cal., May 17, 2022) .............. 2, 3, 12

*Prism Technologies LLC v. T-Mobile USA, Inc.*,
    696 F.App'x 1014 (Fed. Cir. 2017) ................................................................ 13

*Realtime Adaptive Streaming L.L.C. v. Sling TV, L.L.C.*,
    113 F.4th 1348 (Fed. Cir. 2024) ..................................................................... 13

*Std. Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*,
    754 F.2d 345 (Fed. Cir. 1985) .......................................................................... 7

*Sussman v. Bank of Israel*,
    56 F.3d 450 (2d Cir. 1995) ............................................................................... 8

*Zeta Global Corp. v. Maropost Marketing Cloud, Inc.*,
    No. 20 Civ. 3951 (LGS), 2023 WL 355655 (S.D.N.Y., Jan 23, 2023) .................... 13

**Statutes**

28 U.S.C. § 1404(a) ............................................................................................ 4

28 USC § 1404 ............................................................................................ 2, 1, 8

35 U.S.C. § 282(a) ........................................................................................ 11, 12

35 U.S.C. § 285 ................................................................................................ 2, 3

35 U.S.C. § 286 ................................................................................................ 4, 7

**Rules**

F.R.C.P. 12(b)(3) ............................................................................................... 8

1    **I.    INTRODUCTION**

2        After iCharts filed its Notice of Appeal (D.N. 119) of this Court's order granting judgment

3    on the pleadings concerning patent eligibility under Section 101, Tableau has moved to have this

4    case declared exceptional and seeks an award of over $1.8 million in attorneys' fees. In every

5    respect, Tableau's Motion for Attorneys' Fees (D.N. 121) is an overreach.

6        None of Tableau's three articulated rationales for its requested exceptional case finding

7    withstands scrutiny; moreover, its claim for $1.8 million is excessive, and its request to pierce the

8    corporate veil of iCharts LLC is improper and unsupported.

9        Tableau's lead-off argument is based on a newly presented issue—judicial estoppel—that

10   has never been briefed or adjudicated in this action. Tableau has identified no support for the

11   proposition that a non-litigated issue can form the basis for an exceptional case finding – and such

12   a position raises serious Due Process concerns.

13       Tableau's second argument fares no better. Even though Tableau *conceded* that venue was

14   proper in the Western District of Texas, where the case was initially filed, Tableau would have

15   this Court declare that opposing a 28 U.S.C. § 1404 motion to transfer the case to a putatively more

16   *convenient* forum somehow rises to the level of exceptional case. Again, this position is without

17   support.

18       Third, Tableau argues that this case should be declared exceptional based on this Court's

19   grant of judgment on the pleadings—without waiting for the Federal Circuit to weigh in. The single

20   case Tableau cites is inapposite.

21       Finally, Tableau's claim for fees is excessive and, in seeking to impose joint and several

22   liability on non-party Seymour Duncker, improperly seeks to pierce iCharts' corporate veil in

23   contravention of Mr. Duncker's Due Process rights.

24       The Court should not consider Tableau's fee motion until after the Federal Circuit has

25   resolved iCharts' pending appeal. *See also* iCharts' Administrative Motion to Stay Fee Motion,

26   filed contemporaneously herewith. But if the Court does take up the motion, it should be denied.

27

28

## II.    ARGUMENT

### A.    Legal Standards

An award of attorneys' fees is governed by 35 U.S.C. § 285. The Supreme Court, in *Octane Fitness v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014), rejected the Federal Circuit's prior "objectively baseless" and "subjective bad faith" formulation as "overly rigid" and laid out a more flexible framework. *See id.* at 554-558. The Supreme Court thus imbued the word "exceptional" with its ordinary meaning: "uncommon," "rare," "not ordinary," "unusual," or "special." *Id.* at 553-554. The Supreme Court defined an "exceptional" case as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Id.* "District courts may determine whether a case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the circumstances." *People.ai, Inc. v. SetSail Technologies, Inc.*, No. 20-09148-WHA, 2022 WL 1556416, *1 (N.D. Cal., May 17, 2022) (Alsup, J.) (quoting *Octane Fitness*). "The Court may, in its discretion, exclude any hours that are excessive, redundant, or otherwise unnecessary and may reduce the hourly rate if it deems it excessive." *Iris Connex, LLC v. Dell, Inc.*, 235 F.Supp.3d 826, 854 (E.D. Tex. 2017) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983)).

### B.    None of Tableau's Stated Grounds Warrants An Exceptional Case Finding

#### 1.    Judicial Estoppel Cannot Be a Basis for An Exceptional Case Finding Because There Has Been No Adjudication of Tableau's Flawed Judicial Estoppel Theory

Remarkably, Tableau's first putative rationale for having this case declared exceptional is an affirmative defense that has not actually been adjudicated – or even litigated – and as to which Tableau has failed to even provide disclosures in response to discovery requests.

In its Answer, Tableau asserted estoppel as its fourth affirmative defense as a short two-sentence defense. D.N. 18 p.15. In the parties' Joint Case Management Statement, Tableau included two paragraphs about the bankruptcy of iCharts, Inc. in its description of the facts ("ICI") (D.N. 100 p. 5) and listed estoppel as one of the disputed issues "that this action will likely require

1  the Court to resolve." *Id.* But Tableau has never sought any relief or adjudication of its estoppel
2  defense.

3           iCharts propounded discovery to Tableau, including Interrogatory No. 4, which states,
4  "Describe the complete factual and legal basis for each affirmative defense, counterclaim, and
5  assertion that iCharts allegedly is not entitled to the relief it requested in the Complaint that is
6  included in Tableau's Answer and Counterclaims, (D.N. 18), or in Tableau's Answer or
7  Counterclaims to any later amended complaint."  Declaration of Fabio Marino in Response to
8  Tableau's Motion for Attorneys' Fees ("Marino Decl.") Ex. A (Tableau's Responses to iCharts'
9  First Set of Interrogatories) p.9. Tableau provided no substantive response. *Id.* pp. 9-10. Despite
10 repeated efforts to meet and confer (Marino Decl. Exs. B (p. 11), C (p.2) (discovery meet and
11 confer letters covering Interrogatory No. 4)), Tableau did not supplement its response to
12 Interrogatory No. 4 in two subsequent rounds of supplementation. Marino Decl. Exs. D, E
13 (Tableau's supplemental Interrogatory responses). Additionally, although one of Tableau's stated
14 rationales in its motion to transfer the case from the Western District of Texas to this District was
15 that the ICI bankruptcy occurred here and sources of third-party discovery related thereto are local
16 (D.N. 29 at, e.g., pp. 5, 10, 13, 19), Tableau never sought any such third-party discovery.

17          At a minimum, before the Court can even reach the question whether Tableau's putative
18 judicial estoppel defense is a basis for an exceptional case finding, there must be a full and fair
19 opportunity to develop the record and adjudicate the merits of the defense. This includes full
20 discovery as well as full briefing on a merits motion, including the opportunity to submit evidence.

21          On the present record, because the issue of judicial estoppel has not been decided, or
22 litigated, or subject to discovery, it should not form the basis of an exceptional case finding. In
23 *People.ai*, following a finding of patent ineligibility under Section 101, this Court declined to
24 award fees under Section 285. Importantly, this Court specifically "decline[d] to consider material
25 not yet ripe for review that had yet to have any role in this action in an evaluation of
26 exceptionality."  2022 WL 1556416, *3. The same is true here with respect to Tableau's putative
27 judicial estoppel defense.

28

Moreover, a closer look at Tableau's theory of judicial estoppel, as articulated in its fee motion, exposes its many factual and legal gaps. Tableau blithely seeks to paper over those defects with innuendo and gloss.

*First*, Tableau mischaracterizes the 2013 and 2017 communications between ICI and Tableau. Tyz Decl. Ex. 7 includes copies of the email threads, and Tyz Decl. Ex 11 includes a narrative interrogatory response summarizing the communications. Nowhere in either exhibit is a reference by ICI to any assertion that Tableau infringes any claim of the Asserted Patents; to the contrary, the main focus of the communications was ICI's pursuit of some kind of a business or "partnering" arrangement. *Id.* In that context, being aware that iCharts had products that were covered by iCharts' patents is germane to potential business discussions, not a threat to bring suit for infringement. *See* Motion at 3 (citing Tyz Decl. Ex. 11 at 5). The same explanation applies to Tableau's awareness of iCharts' patents in 2017. Contrary to Tableau's assertion that this asserted awareness "eliminate[s] any doubt that Seymour Duncker and [ICI] recognized their claims in 2017," (Motion at 3) the contrary explanation is stated in the next sentence of iCharts' discovery response: "Tableau has been on notice of the Patents-in-Suit since at least as early as 2017. In 2017, iCharts, Inc. (prior assignee of the Patents-in-Suit) and Tableau discussed *Tableau's potential acquisition of iCharts, Inc.,* during which discussions iCharts, Inc. made Tableau aware of iCharts, Inc.'s patent portfolio including the Patents-in-Suit." Tyz Decl. Ex. 11 at p.4 (emphasis added). Similarly, Tableau attempts to make hay out of the fact that the six-year damages period for this case covers the six-year period preceding the filing of the Complaint in October 2023— therefore dating back to October 2017. *See* 35 U.S.C. § 286. Tableau's suggestion that ICI was therefore aware of Tableau's infringement in October 2017 is simply fallacious.

*Second*, Tableau selectively excerpts and mischaracterizes portions of the bankruptcy record. For example, as explained in the Declaration of Lisa Bittle Tancredi in Support of Plaintiff iCharts' Opposition to Defendant Tableau's Motion to Transfer to the Northern District of California Under 28 U.S.C. § 1404(a) (D.N. 45-22; "Tancredi Decl."), there are important distinctions between the face value of assets and the valuation in the bankruptcy estate, which is sometimes determined in terms of an asset's "liquidation value" (aka "the price of the property

1    when it is not allowed sufficient time to sell in the open market"). Tancredi Decl. ¶¶ 6-7. Thus,

2    even if one assumes that the sparse communications from 2013 and 2017—which never discuss

3    patent infringement (*see* Declaration of Ryan Tyz in Support of Tableau's Motion for Attorneys'

4    Fees (D.N. 121-1; "Tyz Decl.") Exs. 7, 11)—could constitute a "claim" for patent infringement

5    requiring disclosure, there is nothing in the record to support an assumption that the bankruptcy

6    liquidation value of such an undeveloped, unarticulated "claim" would be anything other than $0.

7    Tableau certainly had reason to know better than to persist in the mischaracterizations in its Fee

8    Motion; many of them were addressed and dispelled in the Tancredi Declaration.

9         As the Tancredi Declaration explains, Tableau misapplies the bankruptcy term of art,

10   "abandonment," which is a term of art in bankruptcy meaning not that the property has no value,

11   but that the property has no value *to the estate*, for example because the logistics, timing and

12   burden of selling it on a compressed timeframe in the bankruptcy proceeding make it not worth

13   pursuing. Tancredi Decl. ¶ 8. Tableau further misunderstands that the patents and source code were

14   given "liquidation" value, not a market value. Liquidation value "is not the value that a sale of

15   property might yield in the open market" but rather its value when the estate is not allowed

16   sufficient time to sell the asset in the open market. Tancredi Decl. ¶¶7, 8. Because the trustee was

17   unable to liquidate the patents, they were to be abandoned, which does *not* mean that the patents

18   were worthless, but rather that, given time and cost to market and sell them, the assets had no value

19   to the estate. *Id*. ¶¶8, 11. Mr. Duncker then attempted to purchase the patents based on their

20   estimated liquidation, not market, value, as there is no indication in the bankruptcy documents that

21   a fair market value was ever placed on them. *Id*. ¶¶13, 14. The logic of Tableau's own arguments

22   is internally inconsistent. On the one hand, Tableau argues that Seymour Duncker offered to

23   purchase the Asserted Patents, but was rebuffed by the Trustee (Motion at 4), but that this was

24   somehow part of Mr. Duncker's purported scheme to get the patents for free (Motion at 5).

25        *Third,* even assuming that Tableau has correctly characterized ICI's bankruptcy disclosures

26   (which iCharts disputes, *see* Tancredi Decl. ¶¶5, 7–14), Tableau has identified no cases where

27   awareness of patents and possible overlap of the general subject matter of the patents with another

28   party's products constitutes an extant "claim" for patent infringement within the meaning of the

bankruptcy rules. Tableau has not identified any evidence suggesting that ICI actually did know there was a "claim" for patent infringement; nothing Tableau cites suggests that ICI conducted any kind of infringement analysis of any patent claim or that ICI asserted that a patent claim was infringed. Even to the extent, hypothetically, it could be posited that ICI knew of a "claim" for infringement at the time of the bankruptcy that was not properly scheduled, it may be curable if the failure was due to "mistake" or "inadvertence." *Ah Quin v. Cnty. of Kauai Dep't of Transp.*, 733 F.3d 267, 277 (9th Cir. 2013). Indeed, it is not hard to foresee that the position Tableau advocates could lead to a slippery slope and absurd results, where any awareness by a bankrupt patentee of a competitor's products would give rise to judicial estoppel from those patents being asserted against the competitor. The few cases Tableau cites in this portion of its motion are all distinguishable.

In *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778 (9th Cir. 2001), Lawrence Hamilton owned a house and was insured by State Farm. On May 30, 1997, the house was damaged by some disconnected water supply lines, and some items were allegedly stolen. Hamilton filed an insurance claim and toured the house with the insurance adjuster on June 18, 1997 and July 1, 1997, and State Farm continued to investigate through September 1997. In August and October 1997, Hamilton's lawyers wrote to State Farm, threatening litigation if the claim was not quickly paid. State Farm did not pay the claim, and indeed suspected that Hamilton himself was responsible for the losses. *Id.* at 780-781. Hamilton filed bankruptcy on October 31, 1997 and in his subsequent schedules listed a $160,000 loss due to the alleged residential vandalism, but did not list the insurance claim as an asset. The bankruptcy trustee asked if Hamilton was pursuing an insurance claim to recover for the loss, and Hamilton never responded. Ultimately, the bankruptcy was dismissed and the bankruptcy court vacated the discharge of his debts. *Id.* Thereafter, Hamilton sued State Farm for bad faith denial of coverage. *Id.* State Farm moved for summary judgment and for a determination of judicial estoppel. The district court dismissed Hamilton's claim and the Ninth Circuit affirmed. *Id.* at 782, 786. *Hamilton* is distinguishable from the present case in at least several respects: (1) the debtor was clearly aware of the existence of a "claim"; (2) before bankruptcy, the debtor had threatened litigation to enforce the "claim"; and (3) the underlying

claim was based on a discrete event that occurred on a pre-bankruptcy fixed date, not a series of ongoing infringements.

In *In re Coastal Plains, Inc.*, 179 F.3d 197 (5th Cir. 1999), involved a complex commercial transaction concerning the purchase of a company, negotiations for the return of inventory sold to the company on credit, and an intervening bankruptcy filing. *Id.* at 202. While the Fifth Circuit's decision does include the language Tableau quotes ("The debtor need not know all the facts or even the legal basis for the cause of action.")—itself a quotation of an Eastern District of Texas ruling—the general statement in that quotation begs the key question here, concerning the level of knowledge of a claim for *patent infringement* necessary to trigger the bankruptcy disclosure obligation. Nothing in *Coastal Plains* sheds light on that question.

*Fourth*, again even assuming that judicial estoppel might apply in some fashion, Tableau offers no theory as to how such an estoppel would apply to *new acts of infringement* occurring after the bankruptcy filing. Under 35 U.S.C. § 286, damages for patent infringement are recoverable for a period starting up to six years before the commencement of suit, regardless of whether the accused infringer actually started infringement many years before that. *Std. Oil Co. v. Nippon Shokubai Kagaku Kogyo Co.*, 754 F.2d 345, 348, 349 (Fed. Cir. 1985). This is because "each act of patent infringement gives rise to a separate cause of action." *Hazelquist v. Guchi Moochie Tackle Co., Inc.*, 437 F.3d 1178, 1180 (Fed. Cir. 2006) (citations omitted.). In *Hazelquist*, the Federal Circuit relied on this core principle of patent law to conclude that an infringing debtor who continued to infringe the plaintiff's patents following discharge in bankruptcy could be liable for the post-bankruptcy infringement. In other words, defendant's "bankruptcy discharge did not immunize him from suit for those causes of action that arose after the discharge." *Id.* at 1181. The same principle applies here: to the extent (if at all) judicial estoppel could preclude claims for infringement that should have been listed on the patentee's bankruptcy schedules, it does not "immunize" the infringer for post-bankruptcy acts of infringement. The bankruptcy case closed on December 28, 2020. *See* docket for N.D. Cal. Bkrcy Case No. 18-50958. So even if judicial estoppel might apply, it would—at most—truncate the damages period to post-December 28, 2020 damages, rather than post-October 10, 2017 damages. iCharts cannot be estopped from asserting

a patent infringement claim where the infringing conduct did not occur until *after* the bankruptcy. The ongoing nature of patent infringement claims with a six-year rolling limitations period is simply very different from the kinds of time-delimited claims like the ones at issue in *Hamilton* and *Coastal Plains*.

Tableau has identified *no cases* where an affirmative defense that has not been litigated and decided can form the basis of an exceptional case finding. iCharts' own research has found no such cases. Tableau chose not to pursue its theory of judicial estoppel through discovery and motion practice. It cannot now use the mechanism of a Section 285 motion to sneak this theory in the back door without giving iCharts a full and fair opportunity to litigate the merits of the issue and its many nuances. This issue is simply not ripe as a basis for Tableau's Section 285 motion, and even if it could be considered in the exceptional case context, and even if Tableau's defense is ultimately adjudicated to be meritorious, its only impact would be to alter the damages period. This is, manifestly, not a basis for an exceptional case finding.

## 2. Opposing Discretionary Transfer Under 28 USC § 1404 Cannot Be a Basis for An Exceptional Case Finding

Tableau's second argument fares even worse. Tableau *conceded* that venue in the Western District of Texas was "technically [] proper," that it has conducted business in Texas and the Western District of Texas, and that it has employees who work in Austin, Texas. D.N. 18 pp. 2-3, ¶¶ 6-8. Accordingly, Tableau did not move to dismiss the action for improper venue under Federal Rule of Civil Procedure 12(b)(3), but rather, moved to transfer venue for convenience under 28 U.S.C. § 1404. D.N. 29 pp. 7–8. Again, Tableau cites no case law finding an exceptional case for opposing a Section 1404 transfer. And iCharts' research has identified no such cases. To the contrary, the Federal Circuit and the Ninth Circuit have both held that "an attorney need not bring a case in the most convenient forum, but only a proper forum." *Gust, Inc. v. Alphacap Ventures, LLC*, 905 F.3d 1321, 1333 (Fed. Cir. 2018) (citing *Sussman v. Bank of Israel*, 56 F.3d 450, 457 (2d Cir. 1995)); *Newton v. Thomason*, 22 F.3d 1455, 1463-1464 (9th Cir. 1994) (cited in *Sussman*) ("Attorneys are not under an affirmative obligation to file an action in the most convenient forum; their only obligation is to file in a proper forum.").  Since venue in the Western District of Texas

was indisputably proper, opposing discretionary transfer cannot be the basis for an exceptional case finding.

In its Motion, Tableau argues that in the context of opposing the Motion to Transfer, it was somehow improper for iCharts to file an *unopposed* motion for extension of time (D.N. 30), to seek expedited venue-related discovery to address disputed issues about the locations of Tableau's offices and workforce (D.N. 31), to file an *unopposed* request for extra pages for its opposition brief (D.N. 35), and to strike new arguments and evidence that were introduced for the first time in Tableau's reply (D.N. 56). *See* Motion at 5. But none of these filings is remotely unusual or problematic, and it is preposterous for Tableau to suggest that two routine motions *it did not oppose* could be the basis for an exceptional case finding. Furthermore, expedited venue discovery is a common enough request in the Western District of Texas that some judges in that district have standing orders dedicated solely to allowing venue discovery for transfer motions (*see* Amended Standing Order Regarding Venue and Jurisdictional Discovery Limits for Patent Cases, https://www.txwd.uscourts.gov/court-staff/u-s-district-judge-alan-albright/).     It follows that iCharts' request for venue discovery was anything but exceptional.

In its opposition to Tableau's transfer motion, as well as the related motions for expedited discovery and to strike, the central dispute concerned the location and magnitude of Tableau's contacts, and whether venue was even proper in this District. D.N. 31 pp.5–7; 45 pp.3–14; *see, generally,* 56. As noted, venue was proper in the Western District of Texas because Tableau has employees there, and Tableau conceded venue there and waived any challenge to it. iCharts maintained that Tableau's Austin office was in fact its second-largest office after its Seattle headquarters (D.N. 45 p.2; D.N. 31 pp.1-2). Additionally, iChart's predecessor, ICI, had relevant contacts in the Western District of Texas. Before its bankruptcy, ICI had a major established business relationship with Austin-based NetSuite and also engaged with important customers in Texas. D.N. 45 pp. 8, 11. *Both* parties had ties to the Western District of Texas, and potential witnesses and evidence would also be located there for litigation purposes. *Id.* pp.8–14.

In its fee Motion, Tableau argues that this District was a preferable venue, focusing almost entirely on the location of *iCharts*-related witnesses and documents, and *third-party* sources of

prior art. *See, e.g.,* D.N. 29 pp.10–14. *None* of the sources of proof Tableau now relies on to argue exceptionality were Tableau-related. Motion at 5-6. In fact, Tableau's Motion points to no *Tableau*-related sources of proof as justification for transferring to this District. *Id.*

There were serious and significant factual disputes over whether Tableau had *any* offices in the Northern District of California (D.N. 45 p.1). In its fee Motion, Tableau alludes to Tableau employees who "work at two physical offices in NDCA," evidently referencing the offices of its corporate parent, Salesforce (D.N. 45 p.2; *see also* D.N. 39-2 ¶¶6, 7, 9). When iCharts dug into Tableau's presence in the NDCA, it discovered that Tableau—headquartered in Seattle, Washington since 2004—only had an abandoned shell office in the Bay Area: a Palo Alto location at 260 California Ave. D.N. 31-2 p.1. No Salesforce offices (Tableau's separate and independent parent company) were listed on Tableau's website as locations of business. *Id.* In the absence of court-authorized venue discovery, iCharts was forced to investigate further and discovered that the Palo Alto office listed on Tableau's website and characterized by its declarant as still one of its "main engineering locations," was listed for lease. D.N. 45-1 ¶¶7, 8. iCharts' investigator discovered that not only had the office been listed since 2023, but it had been vacated in 2020 and not occupied since. *Id.* ¶¶2-9. The transferring Court *agreed* with iCharts on this point: Tableau could not rely on the Palo Alto office to prove a regular place of business that satisfied venue requirements. D.N. 61 pp.10–11. In this way, not only did iCharts correctly identify a serious venue issue, but the transferring court *agreed* with iCharts and stated that Tableau's ghost office did not meet venue standards.

Tableau belatedly offered a new declaration by third-party Salesforce's in-house counsel in connection with Tableau's sur-reply to iCharts' separate motion for venue discovery. D.N. 39-2. The new declaration implied that the original declaration in support of transfer, by a Tableau engineer, had not referred to the (vacated) Palo Alto office at 260 California Ave. as Tableau's place of business, but rather to Salesforce offices in Palo Alto and San Francisco. *Id.* at ¶¶6, 7, 9. This was misleading: statements in the Tableau engineer's declaration were accurate with respect to the 260 California Ave. location, but not with respect to any of the Salesforce offices. D.N. 45 p.2. The original declaration, purporting to establish Tableau's NDCA place of business,

unmistakably referenced the 260 California Ave. office that Tableau closed in 2020, and *not* any Salesforce office. *Id*. The transferring court ultimately deemed the belatedly disclosed Salesforce offices sufficient for venue to lie in NDCA, although iCharts was not allowed any venue discovery before the case moved to California. D.N. 61 pp.7–8, 11–13.  The transferring court looked to *Salesforce* office space in which *Tableau* employees purportedly work to satisfy venue requirements, a debatable proposition involving whether such space represents *Tableau's* place of business, particularly when iCharts was denied the ability to adduce and test the facts and circumstances of Tableau's possession or control of such space through discovery. *Id*. pp.11–13.

When Tableau argued that the Northern District of California should be the location of litigation, iCharts' decision to oppose was not exceptional; iCharts had good cause to oppose Tableau's motion to transfer, not only because the Western District of Texas was indisputably a *proper* venue, and not only because venue in the Northern District of California was questionable due to Tableau's shifting stories as to its place of business there, but also because, on balance, the applicable transfer factors—based on where the case could have been brought, and the location of witnesses, evidence, and convenience—were, at a minimum, a much closer call than Tableau makes them out to be. D.N. 45 pp.3–7, 8–20; 31 pp.5–7; 56 pp.1–3, 6–7.

### 3.    iCharts' Position on the Section 101 Issue is Not a Basis for an Exceptional Case Ruling

Finally, Tableau relies on this Court's recent grant of judgment on the pleadings as its third argument to support its fee request. But not only is the request premature, having been filed while appellate review is pending, but it is wrong on the merits.

As a starting point, the patents-in-suit, like all patents, are entitled to a presumption of validity under 35 U.S.C. § 282(a), and "[a] patent holder has the right to vigorously enforce its presumptively valid patent." *CertusView Technologies, LLC v. S & N Locating Services, LLC*, 287 F. Supp. 3d 580, 586 (E.D. Va. 2018) (quoting *Homeland Housewares LLC v. Sorensen Research & Dev. Trust*, 581 F.App'x 877, 881 (Fed. Cir. 2014)) (denying exceptional case finding after invalidating patents under Section 101).

The sole authority Tableau cites in this section of its brief, *Inventor Holdings, LLC v. Bed Bath & Beyond, Inc.*, 876 F.3d 1372 (Fed. Cir. 2017), involved a fee motion that was not decided until *after* the Federal Circuit had ruled on an appeal of the 101 ruling. *Id.* at 1371. *See also* Marino Decl. Ex. F (district court docket (D.Del. Case No. 14-448-GMS for *Inventor Holdings*, listing D.N. 87 (9/3/2015 notice of appeal), 88 (9/4/2015 motion for fees), 100 (4/7/2016 notice of ruling on appeal), 107-108, 113 (5/31/2016 and 7/14/2016 orders re fee motion)). The Court here should likewise defer ruling on Tableau's fee motion until after the Federal Circuit resolves iCharts' appeal of the Section 101 issue. *See* iCharts' Administrative Motion to Stay Motion for Attorneys' Fees, filed contemporaneously herewith.

*Inventor Holdings* is distinguishable. The holding depends on the limited circumstance concerning the change in law of *Alice* and whether plaintiffs' theory of patentability for a computer-implemented business transaction remained viable after *Alice*. As the district court explained in *CertusView*, *Inventor Holdings* is limited to the narrow circumstance where the patent issued before *Bilski v. Kappos*, 561 U.S. 593 (2010) and *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66 (2012), and was therefore not entitled to the Section 282(a) presumption of validity. *CertusView*, 287 F.Supp.3d at 594. By contrast, the Patents-in-Suit here, like the patents in *CertusView*, issued after *Bilski* and *Mayo* and are entitled to the statutory presumption of validity. *Id.* Moreover, as the Federal Circuit has observed, post-*Inventor Holdings*, "there is no bright line exclusion of software patents or business method patents from patent eligibility." *Gust, Inc. v. Alphacap Ventures LLC*, 905 F.3d 1321, 1329 (Fed. Cir. 2018). Indeed, in *People.ai*, this Court specifically reached the same conclusion, distinguishing *Inventor Holdings* on its procedural facts just after the *Alice* ruling, and declining to impose an exceptional case finding. *People.ai*, 2022 WL 1556416, *2.

In fact, numerous cases have rejected fees under Section 285 even while finding the patents to be unpatentable under Section 101. *E.g., Miller Mendel, Inc. v. City of Anna, Texas*, 107 F.4th 1345, 1356-1357 (Fed. Cir. 2024) (patent involving software system for managing pre-employment background investigations); *Mortgage Application Technologies, LLC v. MeridianLink, Inc.*, 839 F.App'x 520, 526-527 (Fed. Cir. 2021) (patent on online loan origination

service for creating and populating loan applications); *Prism Technologies LLC v. T-Mobile USA, Inc.*, 696 F.App'x 1014, 1018-1019 (Fed. Cir. 2017) (patents on security systems for use with computer networks that provide a secure transaction system for use with untrusted networks). *See also CertusView*, 287 F.Supp.3d at 600; *Zeta Global Corp. v. Maropost Marketing Cloud, Inc.*, No. 20 Civ. 3951 (LGS), 2023 WL 355655, *1, *4, *5 (S.D.N.Y., Jan 23, 2023) ("It was not unreasonable for Zeta to attempt to distinguish the contrary but constantly evolving case law" concerning software patents and Section 101) (distinguishing *Inventor Holdings*). In *Realtime Adaptive Streaming L.L.C. v. Sling TV, L.L.C.*, 113 F.4th 1348 (Fed. Cir. 2024), the Federal Circuit vacated an exceptional case finding by the district court despite having previously affirmed a Section 101 finding of unpatentability. The Federal Circuit rejected several of what the district court had called "red flags" concerning the merits of the case, and accordingly vacated and remanded the exceptional case ruling.

### C.    Tyz Law's Fee Request is Unreasonable

#### 1.    Tableau's Claimed Fees are Excessive

Even though the only substantive ruling in the case was a motion for judgment on the pleadings, and even though the case was pending for a little over a year, Tableau claims to have accumulated over $1.8 million in legal fees.

Over 40% of that total comes from the billings of just one lawyer, Erin Jones. Tyz Decl. ¶ 19. According to the Tyz Declaration, her "time spent working on this case involved assisting with strategy, overseeing and revising Defendant's motions, motion responses, and discovery, managing the day-to-day activities in this matter, leading technical aspects of the case, developing non-infringement and invalidity positions, researching prior art, leading disclosures and contentions, and working with a technical expert and overseeing the contract attorneys [listed] below in the charting prior art references for invalidity contentions." Tyz Decl. ¶ 22. Two other attorneys, Ciara McHale and Udit Sood, were responsible for "handling day-to-day activities." Tyz Decl. ¶¶ 23, 24. And another attorney, Xiaoyuan Zhang, spent over 110 hours on third-party prior art discovery, researching and analyzing system prior art, and supplementing invalidity contentions, while two contract attorneys, John Giust and Wendy Akbar, spent over 300 hours on

prior art analysis, drafting contentions, and technical analysis of the accused and practicing products. Tyz Decl. ¶¶ 27-28. The combined time spent by those five lawyers—on tasks that significantly overlap with Dr. Jones—totals just 80 hours more than Dr. Jones claims to have spent.

Tableau has allocated approximately $1.5 million of its fee calculations among three buckets, "Motion to Transfer," "Motion for Judgment on the Pleadings," and "Discovery / Invalidity Contentions." This leaves over $300,000 unallocated to any primary category of tasks. This $300,000 should be disallowed.

Tableau has also estimated that $232,091 should be allocated to the Section 1404 Motion to Transfer. But, as explained above, there is no authority to support an exceptional case finding for opposing transfer from one proper venue to another (arguably improper) venue. This amount should also be disallowed.

Most significantly, over $1 million has been allocated to "Discovery / Invalidity Contentions." None of Tableau's arguments for exceptional case relate in any way to discovery or invalidity contentions,[1] other than, arguably, that discovery commenced before Tableau filed its Rule 12(c) motion and the invalidity contention disclosure requirements found in the N.D. Cal. Patent Local Rules became applicable following the grant of Tableau's motion to transfer. Moreover, discovery was still in its early stages when the 101 motion was decided. No depositions had been taken, and few Tableau documents had been produced. *See generally* Marino Decl. Exs. B, C (discovery meet and confer correspondence). Thus, this over $1M figure for "Discovery / Invalidity Contentions" appears excessive.

Additionally, Tableau's own litigation choices played a significant role in protracting these proceedings. Tableau's Section 101 motion was styled as a Rule 12(c) motion for judgment on the pleadings. As such (and disregarding its reliance on factual assertions that were either absent from the pleadings or supported by extrinsic evidence), Tableau could have brought this motion instead

---

[1] Given that Tableau identifies a different category of claimed fees relating to its Rule 12(c) motion, iCharts understands this term not to refer to the development and disclosure of its Section 101 argument, as manifested in the Rule 12(c) motion.

of filing its Answer on December 22, 2023 (after seeking and obtaining two extensions of the Rule 12 deadline). D.N. 15, 17, 18.

If Tableau had filed its Section 101 motion as a Rule 12(b)(6) motion on December 22, 2023, it could have potentially avoided:

- All fees related to "Discovery / Invalidity Contentions"
- All fees related to "Motion to Transfer"

Based on the individual time entries in Tyz Declaration Exhibit 19, and excluding these two categories, the accrued fees between 11/7/2023 and 12/22/2023 would have been limited to the following amounts:

| Name | Hours | Rate | Fees |
|------|-------|------|------|
| Ryan Tyz | 12.3 | $925 | $11,377.50 |
| Erin Jones | 33.0 | $830 | $27,390 |
| Sean Apple | 9.6 | $685 | $ 6,576 |
| Ciara McHale | 0.3 | $830 | $ 249 |
| Tiffany Weger | 3.1 | $320 | $ 992 |
| | | **TOTAL** | **$46,584.50** |

Accepting for the sake of argument Mr. Tyz's assertion that his team accrued $235,157.50 in fees on the Section 101 motion, its total fees accrued would have been *less than $275,000* if Tableau had filed its Section 101 motion at the time its Answer was due.

But Tableau filed an Answer instead of a Rule 12(b)(6) motion, and then filed its motion to transfer a month later, on January 19, 2024. The simplest explanation is that Tableau wanted to forum-shop before filing its Section 101 motion. According to Lex Machina, Judge Pitman, the transferor judge in the Western District of Texas, had only ever entered four Section 101 invalidity rulings in 392 patent cases – and all of those were pre-2016. *See* Marino Decl. Exs. G, H (search

conducted 1/7/2025).[2] By contrast, this Court has entered ten Section 101 invalidity rulings in 221 patent cases—nine of them since 2018. *See* Marino Decl. Exs. I, J (search conducted 1/7/2025).  If Tableau had had confidence in the merits of its Section 101 argument before any Court, it would have brought a Rule 12(b) motion in the Western District of Texas, and virtually all of the categories of fees claimed by Tableau could have been avoided if Tableau had raised its Section 101 argument in a Rule 12(b) motion in December 2023. Even assuming the Court finds this case to be exceptional, iCharts should not be held responsible for the multiplication of Tableau's attorneys' fees due to Tableau's choice to delay the filing of its Section 101 motion.

### 2.    Seymour Duncker Should Not Be Made Personally Liable

Finally, Tableau argues that "[t]he Court should hold Plaintiff and Mr. Duncker jointly and severally liable for Tableau's fees."  Motion at 14. However, as Tableau reluctantly admits in a footnote at the end of its brief, piercing the corporate veil and summarily imposing liability on a non-party is not so simple. In *Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000), the Supreme Court held that Due Process requires observance of procedural formalities: a motion to amend the pleadings to add the non-party, service of process, an opportunity to respond to the pleading, and an opportunity to develop the record and to be heard on any issue putatively imposing liability on the non-party. *Id.* at 466-468.

Thus, rather than a one-paragraph afterthought at the end of its fee motion, an effort to bring Mr. Duncker personally into the litigation would require Tableau to file (and win) a motion to amend the pleadings, followed by the other procedural requisites to preserve his Due Process rights. Another of Tableau's cited cases, *Iris Connex, LLC v. Dell, Inc.*, 235 F.Supp.3d 826, 843-844 (E.D. Tex. 2017) relied on the Federal Circuit ruling in *Ohio Cellular Products Corp. v. Adams USA, Inc.*, 175 F.3d 1343, 1349 (Fed. Cir. 1999), which the Supreme Court reversed in *Nelson*.

Accordingly, this argument, too, is premature; Mr. Duncker is not a party before this Court.

---

[2] The case was initially assigned to W.D. Tex. Magistrate Judge Lane (who, according to LexMachina, has been assigned 33 patent cases and has never issued any patent invalidity rulings), but was subsequently reassigned to Judge Pitman.

## III.    CONCLUSION

For the foregoing reasons, Tableau's motion for attorneys' fees should be denied in its entirety. Alternatively, the Court should defer ruling on the motion until resolution of iCharts' pending appeal.

Dated: January 9, 2025                          Respectfully submitted,

                                                **WOMBLE BOND DICKINSON (US) LLP**


                                                */s/ Fabio E. Marino*
                                                Fabio E. Marino

                                                Counsel for Plaintiff
                                                *iCHARTS LLC*